IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 29, 2006 Session

**MOODY REALTY COMPANY, INC. v. RONALD L. HUESTIS, ET AL.**

**Direct Appeal from the Chancery Court for Weakley County**
**No. 18,992      William B. Acree, Chancellor**

---

**No. W2006-00905-COA-R3-CV - Filed April 4, 2007**

---

This is a breach of contract action for the recovery of a real estate brokerage commission. The trial court found that the parties did not enter into a binding buyer's representation agreement because there was no meeting of the minds. Instead, the court awarded the plaintiff real estate broker damages in quantum meruit. On appeal, we find that the parties mutually assented to the terms of the buyer's representation agreement and that the broker was entitled to its commission as stated in the contract. We vacate the award of damages in quantum meruit, affirm in part, reverse in part, and remand for entry of judgment in accordance with the contract.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part;
Reversed in part; Vacated in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and HOLLY M. KIRBY, J., joined.

Jeffery T. Washburn, Dresden, Tennessee, for the appellants, Ronald L. Huestis and Lisa M. Huestis.

William R. Neese, Dresden, Tennessee, for the appellee, Moody Realty Company, Inc.

**OPINION**

In this action to recover a real estate brokerage commission, Moody Realty Company, Inc. (Moody Realty) alleged that Ronald and Lisa Huestis (Mr. Huestis, Mrs. Huestis, or the Huestises) breached the buyer representation agreement when they refused to pay the commission for their purchase of a dairy farm specifically listed in the agreement. After telling Moody Realty agents they were not interested in the farm, they proceeded to negotiate directly with the seller and to purchase it without Moody Realty's involvement. The dispositive issue on appeal involves the question of contract formation. Specifically, the Huestises contend they were not bound by the buyer representation agreement because there was no meeting of the minds. To support this argument, they rely upon the absence of Mrs. Huestis's signature, Moody Realty's alleged refusal to sign the contract in Mr. Huestis's presence, the alteration of the contract termination date, and Moody

Realty's alleged failure to provide the Huestises with a copy of the contract. The trial court found there was no meeting of the minds and therefore no contract, but it awarded $20,000 in quantum meruit to Moody Realty. On appeal, the Huestises raise the issue of whether the lower court erred in awarding damages in quantum meruit when no proof was offered at trial regarding the reasonable value of the agents' services. Moody Realty raises the additional issue of whether the lower court erred by finding an absence of contract between the parties. We believe the evidence in the record preponderates against the trial court's finding. There was a meeting of the minds, and thus a binding contract, between the parties. We vacate the award of damages in quantum meruit, affirm in part, reverse in part, and remand for entry of judgment in accordance with the contract.

## *Facts and Procedural History*

In July of 2004, the Huestises sought the assistance of Moody Realty in locating a dairy farm to purchase in Tennessee. In late July of 2004, they drove to Paris, Tennessee from their home in Vermont and met with associate broker William Fuchs (Mr. Fuchs) and broker James Oliver (Mr. Oliver), both employees of Moody Realty, to view available farm properties. Mr. Fuchs first showed Mr. Huestis one of their listed properties, the Arnold farm. Then, Mr. Fuchs and Mr. Oliver (the agents) drove the Huestises by the Arnold farm again and proceeded to show them two other farms, the Leach farm and the Hazelton farm, that were not listed by Moody Realty. The Hazelton farm was not listed by anyone at the time of the Huestises' visit, but the agents knew the owners of the Hazelton farm would entertain offers to purchase the property.

On that day, the agents presented a standard, two-page *Buyer's Representation Agreement* ("buyer's representation agreement" or "agreement") provided by the Tennessee Association of Realtors to the Huestises. The first page identifies "Ron Huestis and wife" as the client employing Moody Realty as a non-exclusive agent to locate property for purchase and to advocate on their behalf during any negotiations. The agreement also provides that it is effective from the date of execution until "1-1-06" or until the closing if it occurs before that date. Moody Realty agents had written the termination date of "1-1-06" in the blank supplied. Under the section listing the client's obligations, paragraph two (2) states that the client

> authorize[s] Broker to negotiate for a fee paid by the Seller and/or the Seller's agent, the payment of which will be fully disclosed to Client. If a fee is not offered or paid to Broker, as could occur, for example, in the purchase of an unlisted property, Client agrees to pay Broker a total of . . . 8% compensation based on the total sales price. . . . Broker's fee is earned at the signing by both parties of an agreement to purchase any property(ies) as described above through the efforts of Broker and is due at the closing of any such transaction.

On the first page, the agreement specifically exempts the "Wilford Duncan" property and, on the second page, specifically includes the Hazelton and Leach farms in the space provided for other terms and conditions. This section, also penned by Moody Realty agents, provides as follows:

"This agreement valid on Ron Huestis and is valid for David Leach and Richard Hazleton [sic] dairy farms."

It is undisputed that Mr. Huestis signed the agreement and that Mrs. Huestis did not. Moody Realty offered the original page two (2) into evidence, bearing the signatures of Mr. Huestis, Mr. Fuchs, and Mr. Oliver. At the time it filed suit, Moody Realty could not locate the first page of the agreement but obtained it from attorney Max Speight (Mr. Speight), who had earlier obtained it from the Huestises.[1] Excluding Mr. Speight's notations in the margin (which are irrelevant to this case), both parties authenticated the copy of the first page. All appear to agree that the agents discussed the buyer representation agreement while they were en route from the Arnold property to the Leach farm. And, with the exception of the termination date dispute, the Huestises testified to knowing and understanding the terms of the agreement, which included an eight percent (8%) commission on the sales price of the Hazelton or Leach farm if purchased.

The parties vigorously dispute when the agents signed the agreement and what they provided to Mr. Huestis to evidence the contract. There is no dispute that Mr. Huestis received a copy of the written contract, including the terms penned by Moody Realty, but little in the record clarifies whether Mr. Huestis received a partially or fully executed copy in addition to a completely blank one. First, Mr. Fuchs and Mr. Oliver testified that they both signed the agreement in the presence of Mr. Huestis and that Mr. Fuchs copied the agreement for the Huestises in the Moody Realty office at the end of that day. Yet, their testimony fails to account for the Huestises' possession of partially executed and/or blank copies of the agreement including the handwritten terms.

Unfortunately, the Huestises' testimony brought no clarity to the matter. Mr. Huestis testified that the agents did not sign the agreement in his presence. Alongside these assertions, however, Mr. Huestis made ambiguous statements that clouded his version of events. When recounting his trip to the Moody Realty office at the end of the day, Mr. Huestis stated that he entered the office, got a copy of a contract without a signature, and asked for Mr. Fuchs' signature on it. He continued: "so I figured it would be valid with his signature on it, I put my signature on it after because I assumed my wife had already signed it." This statement seems to suggest that Mr. Huestis and Mr. Fuchs executed an agreement at that time, but then Mr. Huestis testified that he had signed the first contract earlier that day but never saw them sign it. He returned to the office for a second copy and "all I got was a blank copy with no signatures on it, not even mine." Interestingly, Mr. Huestis's attorney could not sort these facts out for the court when asked.

Mrs. Huestis stated that she never saw the agents sign the agreement. Then she gave conflicting testimony about the copies Mr. Huestis received at the end of the day. In her deposition, she stated that he returned from the Moody Realty office with two copies: one blank and one bearing his signature. Then at trial, she stated that she viewed the contract when her husband returned to the

---

[1]When the Huestises were considering Mr. Hazelton's proposal in late 2004, they contacted Mr. Speight to determine whether the buyer's representation agreement was binding on them. They transmitted a copy of an unsigned contract to Mr. Speight by facsimile and requested that he render an opinion as to its efficacy.

car and that it lacked signatures. She recalled her husband saying that he did not have a copy of the contract, that Moody wouldn't sign it, but that he would like a signed copy. When presented with her conflicting deposition testimony, Mrs. Huestis stated that she had been mistaken because she actually relied on what Mr. Huestis said to her rather than viewing the document itself.

We find similar patterns with respect to the termination date dispute. The Huestises contend that the agents changed the termination date twice in the course of the day. According to the Huestises, the agents first changed the date from a six month term to a termination date of January 1, 2005, and discussed the change with both Mr. and Mrs. Huestis. They contend that the agents then changed the date to January 1, 2006, while Mr. Huestis was not present. From most accounts, it appears that the termination date of "1-1-06" was on the agreement when Mr. Huestis signed it. Although Mr. Huestis stated at trial that he was not certain if it was there, Mrs. Huestis and Mr. Fuchs testified to its presence at the time of execution. The Huestises also contend that at the time Mr. Huestis signed the agreement, he thought the contract terminated in 2005. Mrs. Huestis stated at trial that she was present in the car when the agents changed the date to 2006 and that, although they handed her the document and told her of the change, she placed it on the seat and never signed it. Yet, Mrs. Huestis testified differently at her deposition and stated that when her husband returned to the car, Mr. Fuchs told him about the contract, the termination date of 2006, and asked him to sign it. Mr. Huestis then signed it.

Immediately after the showing and at all times thereafter, the couple told the agents that they had no interest in the Hazelton farm. At trial, Mr. Huestis testified that the farm was out of their price range, as the Multiple Listing Service (MLS) information sheet[2] revealed a purchase price of $468,000. Mr. Huestis also stated that he questioned how old the MLS listing information was, but that the agents did not respond to him. Although assuming the sheet to be more than a year old, he apparently never pursued the issue of current pricing or engaged in discussions with the agents about how flexible Mr. Hazelton might be in negotiating the price. The agents, on the other hand, testified that they told Mr. Huestis that Mr. Hazelton would take no less than $400,000 for the farm. Mr. Huestis contended that he learned of this price only from Mr. Hazelton in December of 2004, just prior to their oral purchase agreement.

Mr. Fuchs called the Huestises no less than three (3) times after their visit to determine if they wanted to pursue any of the three farms further. Each time, the Huestises unequivocally stated they were not interested. According to Mr. Huestis, around Thanksgiving of 2004, Mr. Hazelton contacted him to inquire into his interest in seeing the farm again. Mr. Huestis agreed to take another look because he planned to be in the area for other reasons. Mr. Huestis apparently never contacted Moody Realty or notified them that he would be returning to the area and visiting the Hazelton Farm again. During the visit, Mr. Hazelton quoted a $475,000 asking price. They later communicated by

---

[2]The parties dispute whether the agents even provided the MLS sheet to the Huestises. Mr. Fuchs and Mr. Oliver contend they never provided one, and the Huestises contend Mr. Oliver handed it to them while traveling to the farms. The Huestises offered another MLS sheet at trial that showed the most recent asking price for the farm to be $325,000 rather than $468,000. The MLS sheet reflected that the Hazelton farm was offered at this lower price as recent as fourteen months before they viewed the property.

telephone in the first week of December, and Mr. Huestis told Mr. Hazelton they were not interested in the farm because of the pricing. Mr. Hazelton then lowered the price to $400,000, and Mr. Huestis accepted the offer. They reached an agreement that day for the Huestises to purchase the farm for that amount,[3] and they consummated the transaction in January of 2005. Mr. Hazelton and his co-owner executed a warranty deed on January 20, 2005, and recorded the transfer of title to Mr. and Mrs. Huestis four days later.

As we noted previously, prior to entering this agreement and consummating it, Mr. Huestis contacted attorney Max Speight to determine if the buyer representation agreement was binding. He then transmitted copies of an unsigned contract by facsimile[4] to Mr. Speight and understood his opinion to be that there was no contract because nobody signed the agreement.

Mr. Fuchs learned of the pending transaction from Mr. Hazelton and contacted the Huestises in the first week of December 2004. He testified to calling the Huestises several times and insisting on the eight percent (8%) commission stated in the contract. Mr. Huestis refused to pay Moody Realty the commission and contended that there was no binding contract between them.

Moody Realty filed a complaint against the Huestises on March 10, 2005, and alleged breach of contract and violation of the Tennessee Consumer Protection Act (TCPA).[5] It demanded thirty two thousand dollars ($32,000),[6] pre-judgment and post-judgment interest, treble damages, and attorney's fees. The Huestises filed an answer and later amended it with the court's permission. They denied the existence of a binding contract and, as an alternative affirmative defense, contended their performance was excused because of Moody Realty's breach of contract and of fiduciary duty. The Huestises alleged that the agents failed to inform them of all available information on the property, including the most recent asking price of $325,000, and that this failure constituted a breach of fiduciary duty. These omissions also constituted a breach of contract, thus excusing the Huestises' obligation to perform and pay the commission. Moreover, they asserted that because Mrs. Huestis never executed the agreement, she was not bound in any event. They moved the court to dismiss the complaint in its entirety for these reasons. The Huestises also filed a counter-complaint with their amended answer. In it, they identified various undisclosed facts and information and asserted claims for breach of contract, breach of fiduciary duty, and violation of the TCPA. The counter-complaint did not list the money damages sought but instead requested "judgment . . . for such sum that the court finds just and appropriate under the circumstances along with pre-judgment

---

[3] Mr. Huestis testified that, although they had reached an agreement regarding his purchase of the farm for $400,000, their negotiations regarding the sale of equipment continued.

[4] Exhibit 2 reveals that the Huestises provided to Mr. Speight a copy of the agreement with no signatures whatsoever, but the record is unclear as to whether he understood that Mr. Huestis had signed the form.

[5] We note that Moody Realty never included the remedy of quantum meruit in its complaint.

[6] This figure is the equivalent of an eight percent (8%) commission on a four hundred thousand dollar ($400,000) sales price.

and post-judgment interest," treble damages, attorney's fees and expenses, and the dismissal of Moody Realty's complaint.

After Moody Realty filed its answer to the counter-complaint, the Huestises filed a motion to dismiss the TCPA claim for failure to state a claim upon which relief may be granted, along with a memorandum of law and with excerpts from Mr. Fuchs' deposition. The parties appeared before the chancellor, who decided not to rule on the motion. Then, on March 10, 2006, Circuit Judge William Acree, sitting by interchange, effectively dismissed the Huestises' motion and then presided over the two-day trial.

At the conclusion of the proof, Judge Acree discussed the issue of contract formation as follows.

> The question of whether or not there was a contract between the parties, the Court finds that there was not a meeting of the minds in this case for several reasons.

> First of all the contract was signed by - - in a haphazard manner. It was signed - - there [were] changes made. It was signed in a car rather than a business office as one would expect. There were kids, small children involved present.

> The parties never did sit down and say, look, here's what we're agreeing to and explain all that. It was not presented in that manner as you would normally expect a contract to be signed.

> Mrs. Huestis did not sign the contract. It was handed to her, and she just laid it down and didn't sign it, and I don't understand why if the parties did agree upon the contract why she wasn't questioned about this, Mrs. Huestis, you're going to sign this or you're not going to sign it or what is the situation.

> And, finally, there was no complete copy of the contract kept. I know that was not - - I understand that copies can be acceptable in evidence, but taking this circumstance in with the others; that is, that nobody bothered to keep a complete copy of the contract leads the Court to conclude that there was no meeting of the minds and no contract.

In a decree entered on March 29, 2006, Judge Acree dismissed both Tennessee Consumer Protection Act claims and ruled, in pertinent part, as follows:

3.      Defendants' counterclaim is denied and dismissed with prejudice in its entirety.

4.      Plaintiff's cause of action for breach of contract is denied and dismissed with prejudice.

-6-

5.	Plaintiff is granted judgment against Defendants, jointly and severally, in the amount of twenty thousand dollars ($20,000) for services provided Defendants, *quantum meruit*.

The Huestises then timely filed their notice of appeal.

### *Issues Presented and Standard of Review*

The parties collectively present two issues, restated below, for this Court to address. The Huestises raise the following issue:

(1)	Whether the Chancery Court of Weakley County, Tennessee, erred in awarding the plaintiff $20,000 for services, quantum meruit, after ruling that a real estate agency's Buyer's Representation Agreement was not a valid contract and in view of the fact that the plaintiff failed to present any evidence during the trial relative to the reasonable value of the goods or services provided to the defendants.

Moody Realty, on the other hand, presents the following issue:

(2)	Whether the trial court erred in denying and dismissing Moody Realty's claim for breach of contract.[7]

Our analysis begins and ends with the issue of contract formation. Our holding that the parties did enter into a binding contract thus obviates the need to address the remedy of damages in quantum meruit.

In a nonjury trial, our standard of review is *de novo* on the record. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). We apply a presumption that the trial court's findings of fact are correct and will reverse the court below only if the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We do not apply that presumption, however, to the trial court's conclusions of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

### *Analysis*

In light of the trial court's finding that there was no meeting of the minds and therefore no contract, we begin with Huestises' arguments concerning this issue. In essence, they insist that they are not bound by the buyer's representation agreement because the Moody Realty agents did not sign the contract in the presence of Mr. Huestis; because the agents altered the termination date without

---

[7]We note as an initial matter that on appeal, the Huestises do not raise the issue of the trial court's dismissal of their counter-complaint for breach of contract, the substance of which they utilized as an affirmative defense to establish that Moody Realty's breach excused them from performing.

Mr. Huestis's knowledge; because they did not receive a copy of the contract signed by both parties; and because Mrs. Huestis did not sign the contract.

The Huestises appear to attack assent on both sides of the contract. They first suggest that the agents did not assent because they did not sign the agreement in the presence of Mr. Huestis. They next contend that, even though Mr. Huestis signed the agreement, his signature did not constitute effective assent because he was ignorant of the change in the contract termination date. Although we perceive these arguments to be disingenuous, we nevertheless address them below and find that the record reveals mutual assent even if we assume the Huestises have presented an accurate version of events.

The Huestises also assert that the trial court had a basis to void the contract as against public policy under Tennessee Code Annotated Section 62-13-312(b)(8). They contend that this provision requires real estate agents and brokers to provide a written copy of the agency contract, executed by both parties, to the client for the contract to be valid. Yet, the statutory authority cited by the Huestises applies only to a disciplinary action, and we are unconvinced that Moody Realty violated it in any event. This authority thus cannot serve as a statement of policy upon which this Court will void a contract. Finally, the record contains insufficient evidence to conclude that Mrs. Huestis assented to be bound by the contract. Even though she failed to sign it, that failure does not vitiate the contract between Mr. Huestis and Moody Realty.

*Mutual Assent to be Bound*

The Huestises first contend that the agents' refusal to sign the agreement in the presence of Mr. Huestis prevented the formation of a binding contract. A contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Staubach Retail Servs.-Southeast, L.L.C. v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2004)(quoting *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)(citations omitted)). Courts determine mutuality of assent by assessing the parties' manifestations according to an objective standard. *Id.* In other words, we must determine whether a reasonable onlooker, based upon the parties' outward manifestations, would conclude that the Huestises and the agents agreed to be bound by the terms of the written contract.

We first note that the signatures of parties to a written agreement are not always essential to establish a binding contract. *Id.*; *T.R. Mills Contractors, Inc. v. WRH Enters., L.L.C.,* 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002). One function of the signature is to show the signor's intent to be bound by the terms stated, but other manifestations of assent can serve the same purpose in the absence of signature. *See Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002). The parties' actions or inactions, as well as spoken words, can establish mutual assent. *Id.*(citing *Cole-McIntyre-Norfleet Co. v. Holloway*, 214 S.W. 817, 818 (Tenn. 1919)). "[T]he existence of a contract, the meeting of the minds, the intention to assume an obligation, and the understanding are to be determined ... not alone from the words used, but also the situation, acts, and

-8-

the conduct of the parties, and the attendant circumstances." *Scandlyn v. McDill Columbus Corp.,* 895 S.W.2d 342, 345 (Tenn. Ct. App. 1994)(quoting *APCO Amusement Co. v. Wilkins Family Rests. of America,* 673 S.W.2d 523, 527 (Tenn. Ct. App. 1984)(citations omitted)).

In this case, the trial court made no findings regarding when or before whom the agents signed the contract, and the proof at trial clarified very little. Nevertheless, we believe the record supports a finding of mutual assent to be bound even assuming the agents did not sign the agreement in front of Mr. Huestis. When only one party signs a written contract that contemplates the signatures of both parties (but does not expressly require it), the law considers it to bind both parties when the non-signing party accepts it. *See Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 350 (Tenn. Ct. App. 1999). There is no question that the agents signed the agreement at some point, but assuming the agents did not sign the agreement in Mr. Huestis's presence, the pivotal question then becomes whether the Moody Realty agents sufficiently manifested their assent to be bound at that time. Or, in other words, we consider whether the agents accepted Mr. Huestis's offer.[8] We believe the evidence is clear that they did.

First, Mr. Huestis testified that, when asked if they were going to sign the contract, the agents told him that they did not need to do so. We view this statement, if accurate, as confirmation of their intent to be bound rather than as a rejection of Mr. Huestis's offer. Although Mr. Huestis stated to his wife that he didn't think they had a contract without the agents' signatures, he does not assert that he communicated this understanding to the agents themselves. Thus, Mr. Huestis's subjective understanding of this statement, if uncommunicated to the agents and in conflict with an objective interpretation, has no effect on our analysis. In our estimation, the reasonable onlooker would view this statement as a manifestation of the intent to be bound. Even more, it evinces a belief that the contract already had binding effect. Second, Moody Realty agents not only prepared and worded the agreement, but they also selected the terms written in the blank spaces. The fact that the agents drafted the very agreement signed by Mr. Huestis, coupled with the statement above, strongly suggests their assent to be bound.

Third, the agents proceeded to show the Huestises the Hazelton farm after Mr. Huestis undisputedly executed the agreement. The Hazelton farm was unlisted at that time and would not have been easily identifiable by non-local buyers. The reasonable person would thus presume that the agents would identify and show the unlisted property only after entering a binding contract that

---

[8]The legal mechanism by which parties show their assent to be bound is through offer and acceptance. Generally, when the parties use a form contract providing spaces for both signatures, the party first signing the form is considered the offeror, and the party signing second the offeree. *See* C.J.S. *Contracts* § 75. Though an argument exists for casting Moody Realty as the offeror, we instead will adhere to this general approach and determine whether the agents sufficiently accepted Mr. Huestis's offer.

We see no reason to address Mr. Huestis's assent, as he signed the agreement and, by signing, manifested his assent to be bound by its terms. Mr. Huestis's request for copies of the contract at the end of the day further supports this conclusion.

would secure a commission on its sale. The agents began to perform under the contract when they showed the Huestises the Hazelton farm.

Finally, Mr. Fuchs' subsequent telephone calls to the Huestises reflected the agents' understanding that the representation agreement was indeed valid. Had he not intended or understood himself to be bound by the contract, Mr. Fuchs would not have taken the time to follow up no less than three times with Mr. Huestis. In sum, even if Mr. Huestis subjectively believed the agents had not accepted the offer or assented to be bound by the contract, the objective onlooker would view the agents' statements and conduct as clear manifestations of assent. Even if the agents signed the agreement weeks later, they effectively accepted Mr. Huestis's offer on the day they identified and showed him the Hazelton farm.

*Mutual Assent to the Terms of the Written Contract*

The formation of a contract also depends upon mutual assent to sufficiently definite terms. *Staubach Retail Servs.*, 160 S.W.3d at 524. The Huestises contend that Mr. Huestis could not have assented to the terms of the contract if he was unaware of the changed termination date. Tennessee Code Annotated Section 47-50-112(a) provides that:

> [a]ll contracts . . . in writing and signed by the party to be bound . . . shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written; provided, that nothing herein shall limit the right of any party to contest the agreement on the basis it was procured by fraud or limit the right of any party to assert any other rights or defense provided by common law or statutory law in regard to contracts.

Tenn. Code Ann. § 47-50-112(a) (2001). Mr. Huestis, the party to be bound, signed a written agreement, and we begin with the presumption that it contained his intentions and that he assented to be bound by those terms. Our review of the record reveals that the "1-1-06" termination date was on the agreement at the time he signed it. The factual dispute hinges mostly on the extent of Mr. Huestis's awareness of that date; yet, there is no need to determine what Mr. Huestis knew and when he knew it. Mr. Huestis's awareness of the term is irrelevant in this analysis because he had an obligation to read the agreement before signing it, is thus charged with the knowledge of the terms therein, and, in any event, ratified the agreement by seeking additional copies of the contract and by failing to object to the term after he learned of it that very day.

One who signs a contract cannot later plead ignorance of its contents if there was an opportunity to read it before signing. *See Solomon v. First American Nat'l Bank,* 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989). The law will not allow a party to enter a contract and then seek to avoid performance because he did not read the agreement or know its contents. *Giles v. Allstate Ins. Co.*,

871 S.W.2d 154, 157 (Tenn. Ct. App. 1993) (citing *Beasley v. Metro. Life Ins. Co.*, 229 S.W.2d 146 (Tenn. 1950)). Otherwise, written contracts would be worthless. *Id.* In general, the law holds parties responsible for what they sign. *See id. But see Teague Bros. v. Martin & Bayley, Inc.*, 750 S.W.2d 152, 158 (Tenn. Ct. App. 1987)*(*excluding from this general rule situations in which the neglect to read was induced through artifice or trick by the party seeking to enforce the contract). In this case, Mr. Huestis signed a two-page contract with only a handful of written terms. The termination date was the second handwritten term, located on the first page of the agreement, just under his handwritten name identifying him as the "Client." Not only was the term conspicuous, but the agreement was concise. If Mr. Huestis signed this agreement without reading it first, which appears to be the case, then he did so at his own peril.

The Huestises suggest in their reply brief the possibility of mistake, fraud, or misrepresentation. For example, they argue that there could be no mutual assent when Mr. Huestis was mistaken as to the expiration date. They also imply that the agents surreptitiously altered the termination date without Mr. Huestis's knowledge and tricked him into signing the agreement. They have done nothing more than suggest these formation defects on appeal and have cited nothing beyond a passing reference to them from a *Corpus Juris Secundum* volume. Even if the Huestises had proven fraud with respect to the termination date, Mr. Huestis ratified the agreement by acquiescence. If, after discovering fraud, a party implies his acquiescence in the act or remains silent in situations suggesting his acquiescence, he cannot then maintain a claim in fraud. *Brandon v. Wright*, 838 S.W.2d 532, 534 (Tenn. Ct. App. 1992) (citing *Gilbert v. Hunnewell*, 59 Tenn. 289 (1873)). Indeed, a voidable contract can be ratified by acts or statements, and one who has failed to object timely to the circumstance while aware of it has confirmed its validity. *Id.*(citing *Fidelity Bank & Trust Co. v. Cain Partnership, Ltd.*, 738 S.W.2d 638 (Tenn. Ct. App. 1987); *Russell v. Zanone*, 404 S.W.2d 539 (Tenn. Ct. App. 1966)). Mr. Huestis testified that he knew about the term by the end of the day, yet he nevertheless sought another copy of the contract, failed to object to the term, and took Mr. Fuchs' subsequent calls without mentioning anything about the validity of the contract or the alleged surreptitious alteration of the termination date.

*Voidness and Public Policy*

The Huestises also assert that the trial court could have voided the contract as violative of public policy under Tennessee Code Annotated Section 62-13-312(b)(8). The Huestises argue that this provision requires real estate agents and brokers to provide a written copy of the agency contract, executed by both parties, to the client for the contract to be valid.[9] That section, however, exists only to "provide guidelines for disciplinary actions taken by the Tennessee real estate commission against licensees found guilty of the [listed] violations." Tenn. Code Ann. § 62-13-312(e) (1997). Indeed,

---

[9]The provision allows the real estate commission to take disciplinary action in the event a licensee fails "to furnish a copy of any . . . contract relevant to a real estate transaction to all signatories thereof at the time of execution." Tenn. Code Ann. § 62-13-312(b)(8) (1997).

this Court has found that this particular section does not prohibit even oral listing agreements. *See, e.g., Parks v. Morris*, 914 S.W.2d 545 (Tenn. Ct. App. 1995). And, although the Tennessee Code's provisions addressing representation by real estate agents require a "written bilateral agreement that establishes the [agreed-upon] terms and conditions" for an agency relationship to arise, they do not expressly require both parties' signatures on the written agreement. *See* Tenn. Code Ann. § 62-13-401 (1997) (providing also that an agency relationship is not necessary for a real estate agent to provide services to a party in a prospective transaction). Nor did the Legislature include real estate brokerage contracts *per se* in the statute of frauds. *See* Tenn. Code Ann. § 29-2-101 (2000 & Supp. 2006). If it had, though, this agreement would satisfy the statute, as the "party to be charged," Mr. Huestis, signed it. Indeed, once a written contract has been signed by one party and accepted by the other, it is a binding written contract in the contemplation of the law. *See T.R. Mills Contractors,* 93 S.W.3d at 866*; Buddy Lee Attractions*, 13 S.W.3d at 350. Ironically, the party providing the missing first page of the contract is the very one seeking to avoid the obligations listed therein.

*Absence of Mrs. Huestis's Signature*

The record contains very little evidence regarding Mrs. Huestis's dealings with the Moody Realty agents. It reveals little more than Mrs. Huestis's presence during most of the interactions with the agents, her inquiry about the contract before its completion and presentation to the couple, and her mere placement of it on the car seat when asked to sign it. Even though Mrs. Huestis admitted that she might have signed the contract if she had discussed it further with her husband that day, we find no outward manifestations of assent on her part. We therefore conclude that Mrs. Huestis was not a party to the contract with Moody Realty. We also conclude that the absence of her signature on the agreement does not undermine the formation of the contract between her husband and the agency. There is no express language requiring her signature for the contract to be valid, and the handwritten term on the second page recites that the contract is binding on "Ron Huestis" for the identified properties. Thus, the absence of her signature, the wording of the document itself, and the surrounding circumstances bring us to the conclusion that Mrs. Huestis was not a party to the contract but that, notwithstanding this fact, the contract remained binding upon her husband.

*Performance, Breach, and Damage*

If the agents discharged their obligations under the contract and the Huestises refused to pay the commission following their purchase of the farm, then there is breach of contract and entitlement to money damages. Although the trial court never reached the issue of whether the Huestises breached the contract, the record amply supports such a finding: they refused to pay the commission. As for Moody Realty's performance, the agents tendered valuable services to Mr. Huestis when they identified a dairy farm the Huestises were unlikely to locate without an agent's assistance and gained access to the property for their consideration. And, although the contract states that Moody Realty earns the commission when the buyer and seller enter a contract for purchase through the efforts of

the agency, Moody Realty discharged its obligations under the contract and earned its commission.

Where parties to a bilateral contract are obligated to carry out certain tasks that are necessary for the realization of benefits under the agreement, each party has the right "to proceed free of hindrance by the other party. [I]f such other party interefere[s], hinder[s], or prevent[s] the performance to such an extent as to render the performance difficult and diminish the benefits to be received, the first party [can] treat the contract as broken and [is] not bound to proceed under the added burdens." *Wil-Helm Agency v. Lynn*, 618 S.W.2d 748, 751–52 (Tenn. Ct. App. 1981). Mr. Huestis hindered the agents from providing their full range of services when he unequivocally told Mr. Fuchs by telephone that he was not interested in the Hazelton farm and when he failed to contact Moody Realty to inform the agents of his newfound interest in late November or early December.

"[W]here the obligation of a party depends upon a certain condition being performed and the fulfillment of that condition is prevented by the act of the other party, the condition is considered fulfilled." *ACG, Inc. v. Southeast Elevator, Inc.*, 912 S.W.2d 163, 167-168 (Tenn. Ct. App. 1995) (quoting from an opinion of the Texas Court of Appeals and equating the Texas rule to its Tennessee counterpart). Although the contract between Moody Realty and Mr. Huestis contemplated the performance of more extensive services, we consider the agents to have fully performed under the contract where the Huestises never told them of their interest in the property and thus never allowed them to perform the services they were prepared to deliver.

Finally, the Huestises attempted to set up the defense of excused performance by virtue of the agents' breach of fiduciary duty, but most of their allegations on the subject lacked merit in light of their immediate disavowal of interest in the property. For example, the Huestises complained of receiving an old MLS sheet with an inflated price, but Mr. Huestis never testified to inquiring into the purchase price of the farm beyond what was shown on the MLS sheet or to asking about the agents' opinion of how flexible Mr. Hazelton might have been in negotiating a lower price. In any event, the Huestises failed to present any argument in their reply brief concerning this issue and failed to raise the issue of the trial court's dismissal of their breach of contract claim. We therefore conclude that the agents performed under the contract, Mr. Huestis breached it, and Moody Realty is entitled to its eight percent (8%) commission.

### *Conclusion*

We believe the evidence preponderates against the trial court's finding that there was no meeting of the minds and thus no contract. On the contrary, we find the record amply supports mutual assent to the terms of the contract. Mr. Huestis signed the contract, and the agents manifested their assent by their statements, conduct, and signatures on the document. We also find that the record reveals that the "1-1-06" termination date was on the document at the time Mr. Huestis signed it. The buyer's representation agreement was a concise, two-page document, and the

-13-

termination date was conspicuous. As parties to a contract are under a duty to read written agreements and are thus responsible for what they sign, we accordingly hold Mr. Huestis to the terms of the buyer's representation agreement. Even if he was unaware of the termination date when he signed the agreement, he learned of it that day yet failed to take action and object to the term.

We accordingly vacate the trial court's award of damages in quantum meruit and reverse the trial court's finding of no contract as to Mr. Huestis. We otherwise affirm the trial court's judgment and remand this case for entry of judgment in accordance with the contract. Costs of this appeal are taxed to Ronald L. Huestis, Lisa M. Huestis, and their surety, for which execution shall issue if necessary.

_____

DAVID R. FARMER, JUDGE