IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 5, 2010 Session

## ADVANCED PHOTOGRAPHIC SOLUTIONS, LLC v. NATIONAL STUDIOS, INC., ET AL.

**Appeal from the Circuit Court for Bradley County**
**No. V-08-531      Lawrence H. Puckett, Judge**

**No. E2010-00035-COA-R3-CV - Filed February 8, 2011**

Advanced Photographic Solutions, LLC ("Advanced") sued National Studios, Inc. a/k/a NSI Closeout, Inc. ("National")[1] and Harold C. Lewis ("Lewis") alleging that National owed on an account that was in default. After a jury trial, the Trial Court entered its Final Judgment on the jury's verdict finding, *inter alia*, that Advanced had a contract with National, that National had breached the contract, that Lewis had a contract with Advanced providing his personal guaranty to pay National's debt, and that Lewis had breached his contract of personal guaranty. The Final Judgment awarded Advanced judgment against National and Lewis jointly and severally in the amount of $400,526.70, and judgment against Lewis solely in the amount of $54,806.00 as attorney's fees. National and Lewis appeal to this Court. The issues raised on appeal concern whether there was material evidence to support the jury's verdict. We find that the record contains material evidence to support the jury's verdict, and we affirm the Trial Court's Final Judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Brian E. McGovern, and James A. Hajek, Chesterfield, Missouri admitted *pro hac vice*, and M. Andrew Pippenger, Chattanooga, Tennessee, for the appellants National Studios, Inc. a/k/a NSI Closeout, Inc., and Harold C. Lewis.

William J. Brown, Cleveland, Tennessee, for the appellee, Advanced Photographic Solutions, LLC.

---

[1]Advanced also sued National Studios, Inc. a/k/a National Studios Acquisition Corp., but voluntarily took a non-suit as to this entity before trial.

## OPINION

### Background

After years of doing business together, Advanced sued National and Lewis alleging that National owed Advanced more than $360,000 on an account that was in default. Advanced alleged that Lewis had personally guaranteed payment of this debt. The case was tried before a jury in September of 2009. As the issues on appeal involve whether there was material evidence to support the jury's verdict, we will cover in some detail the evidence as presented to the jury.

Gene Harrell ("Harrell"), president of Advanced testified at trial. Harrell testified about Advanced stating:

> There has been three transactions, that is, a change of ownership, from Coppinger. It started as Coppinger Color Lab, which was purchased by AFP, Inc., which was then purchased by Color Lab Acquisitions Company, LLC. And that is when AFP, Inc., was in Chapter 11 bankruptcy. And then in 2007 there was a transaction that I sold, being 100 percent owner of the company, I sold my interest in 2007 to a group in Atlanta - - … Me personally, I sold my interest. And there was a new company set up at that time for ownership. The name has been the same throughout.

Harrell further explained that in 1992 when Coppinger Color Lab sold to AFP, the assets of Coppinger Color Lab were conveyed to Color Lab Acquisition, Inc. Harrell also stated: "when Color Lab Acquisition Company purchased the assets, I was president of the new company." Harrell did not have an ownership interest in AFP, but was the president of that entity, which was in bankruptcy. He testified that the bankruptcy prompted him and a group of investors to create Color Lab Acquisition. Assets were transferred from AFP Color Lab, Inc. to Color Lab Acquisition Company, including the accounts receivable. Some time after the assets were transferred, Color Lab Acquisition changed its name to Advanced Photographic Solutions, LLC. In June of 2007, Harrell was president and owned an interest in Advanced Photographic Solutions, LLC. At that time, there was an asset purchase by Advanced Photographic Solutions Acquisition Company, LLC that included the accounts receivable. The company name then was changed from Advanced Photographic Solutions Acquisition Company, LLC back to Advanced Photographic Solutions, LLC.

Harrell first became acquainted with Lewis in 1986 or 1987. At the time he became acquainted with Lewis, Harrell was working for Coppinger Color Lab. Coppinger Color Lab began doing business with National.

Lewis executed a Guaranty of Individual ("Personal Guaranty") in May of 1987. In pertinent part, the Personal Guaranty executed by Lewis states:

FOR VALUE RECEIVED and in consideration of any loan or open account credit, now or hereafter made to NATIONAL STUDIOS, INC., (together with its successors and assigns, "Borrower"), which loans or credit line will be to the direct interest and advantage of the undersigned, a stockholder and director of Borrower, by Coppinger Color Lab, Inc. and its affiliates ("Coppinger") and to induce Coppinger from time to time to extend credit to Borrower, the undersigned and Coppinger agree as follows:

I. Character of Obligation. The undersigned hereby unconditionally guarantees the full payment and performance by Borrower of any such loans, advances, or extension of open account credit, … in favor of Coppinger, and all other obligations of Borrower to Coppinger however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, or due or to become due (hereafter the "Obligations").… The obligation hereunder may be considered by Coppinger either as a guaranty or agreement of surety.…

* * *

IV. Benefit. This Guaranty shall bind the undersigned, his heirs, personal representatives and assigns, and the rights and privileges of Coppinger hereunder shall inure to the benefit of its successors and assigns, and this Guaranty shall be effective with respect to loans or advances made by Coppinger's successors and assigns to Borrower.

Harrell described National stating:

they are the retail arm of the total transaction. They have representatives that go into a store location and set up a display of portraiture and solicit customers as they are in the store to sell them for an opportunity to bring their family or children in for a sitting that is to be scheduled one or two weeks later.

When that takes place, then they send a photographer back in to photograph those families, or kids, that sitting, that photographic sitting. They would send us the images. We would process and produce the package of portraits. In the early development of National, they were using previews, proofs, and they would have a representative that would go back in front of

these customers and sell portraits to them.

Harrell testified about the balance on National's account stating:

In the period between '87 and 2003, their account balance would have varied probably to a low of a hundred thousand and as high as half a million based on the time of the year, the season. There were times that they did as much as 130,000 in 30 days with me.

When asked what products he was selling to National, Harrell stated:

Initially in '87, I was selling Mr. Lewis a service that was a - - we called it proof and delivery. They were going out and photographing and we were producing 3 and a half by 5 proofs, 10, 12 proofs per family. And they were taking them back and showing the proofs and then they were ordering the 8-by-10s and all the products from that.

Mr. Kraxner at that time was - - I was supplying him with a package, a full-blown package, 12, 13, 14 8-by-10 units and that was a marketing plan that he used.

I don't remember the exact year that National changed off of that concept, that marketing concept, but they actually converted to the program that Mr. Kraxner was doing. And in the period from 2002 through 2008, they were totally involved in the package concept.

Harrell testified about the prices he was charging National for photographic services stating:

This is pricing that was given to Mr. Lewis and Mr. Hessler in September of 2002. I met with them and discussed the fact that we needed a price increase, which I had given to all of my other customers.

At that particular time they told me that they were in the process of trying to sell their company to another individual - - I do not remember the individual - - and they asked me to give them a period of time that I would not raise their prices.

So I requoted - - if you'll notice at the top of the quote, there's a quote from September 1st, 2002, to January 31st, 2003, for $8.50. Then on February

1st, 2003, forward I was going to go to nine fifteen. I charged them $8.50 starting in September and that price has not changed through January 2008. The pricing has stayed the same that it was quoted in 2002.... Exhibit A is family color. That is off of film. That is the traditional work that they've been doing for years off of film, directly off of film.... Again, in B I had quoted them a price of eight ninety-five. That price was to go up to nine fifty-seven in February 1st, 2003. I charged the eight ninety-five starting in September 1st, 2003. That price of eight ninety-five has stayed in place through January of 2008. There's been no change in that price since 2002 through 2008.... That was published in a price quote given to them in 2002. And that is a sepia from film, from black and white film. That was the service.... We had not started the process of digital scanning film for them at that time so was not a service that they asked me to quote them specific packages on. But I did go ahead, as you will see, I went ahead and quoted them on the individual unit prices for that going forward.

Now, the prices that I ultimately ended up charging for that was greatly reduced from what I had given them a quote. I quoted them at 76 cent a unit in 2002. The actual price, as we transitioned from black and white film into the scanned image, which would be C, D, and E, stayed the same. I kept it at eight ninety-five. Instead of charging them it would have been almost ten bucks at this price for digital units, I kept it the same price - - eight ninety-five for Triple Play. The same price I charged for sepia from film I charged for the Triple Play. That stayed in effect from 2004 is when they started using the Triple Play, that stayed into effect through January of 2008, same pricing.

Harrell also testified about a package labeled 'F' stating:

The price of the 16 mini wallets was taken off this price quote. Sixty-two cent, that was quoted. The 12-by-16 did not exist then and I used the theory of the square inch cost for a 10-by-13 and calculated that to the square inches in a 12-by-16 and that's what I charged. I think it was 49 cent [sic] more.

When asked if package F was his idea, he stated: "No. That was their request of me to offer that product.... And I also designed an order form for them to order that product."

When asked if he was contacted about the prices in the quote, Harrell stated:

I never received a conversation specifically on the details of that. I received multiple times, I would say 2004, '05, and '06, conversations from Mr. Lewis

saying the pricing is incorrect - - I know it's wrong, the pricing is wrong.… My response to him each time was if we've got something that's been invoiced incorrect we'll fix it. And I would take a sample of what you're passing, this exhibit, and I would fax that to his person in charge of accounting, his CFO, his CO, ever who was doing the accounting, and I would - - I know at least three different times I visited with three different people and specifically went over that in detail.

Harrell did not have an exclusive agreement with National to provide photographic services. National was free to use other providers if they so chose. Harrell stated:

They would schedule the photography and they would send us the work and they would send us an order each week on what we had to produce in services for that order.… There was not a guarantee [that Advanced would receive an order from National], but we did get one every week and we did get one every week for the whole year during this whole period of time.

With regard to the account balance, Harrell testified:

This was always the largest amount that we had outstanding with any customer. And so we tried to supply them with every possible bit of data and information that we could supply them with to help make certain that they had a heads up of what was going on.

So each week we would send them a running sheet for the complete year. And each week we would report how much we had invoiced them for that week, total dollars, how much rebates, if any, were issued for that week. We would also record the payments, whatever payment they made for that week, and the balance due. It would go for each week.

Harrell explained that:

[A]t year 2003, they ended up owing us 415,000; and at the end of 2004 they only owed us 277,000. So during that year they made headway. They paid the bill down by better than $140,000.

The next year, at the end of 2005 they got it down to under 200,000. At the end of 2005, in the Christmas - - a good Christmas present that year, they got it down under 200,000. 191,000 is what they owed.

-6-

At the end of 2006, they owed 388,000.  So it went up 188,000 in one year.  I can't say specifically why that happened.  Obviously, they didn't pay what we shipped to them during that period of time.  But I … I don't know specifically why it happened; I just know factually it happened.

And then we go to the end of the year 2007, and it's back up to 470,000.

Harrell testified: "I didn't hear any conversation in the year 2003 or 2004 about pricing being incorrect.  In 2005 I would say, yes, I don't remember the date, but Harold said something's wrong with the billing."  When asked if he communicated with Lewis or Michael Hessler ("Hessler") about billing, Harrell stated:

I would first discuss with Mike [Hessler] and Mike was very consistent in saying, You need to talk to Harold [Lewis].  And when I would talk to Harold, Harold would just say, Something's wrong, the billing's wrong.  And that's when I would comment, Harold, if the billing is wrong, show me what's wrong and I'll fix it and I will get with your people and I will go over it again.

Each time through one, two, three controllers, and Mr. Perkins would make four times, four different times I supplied them with the price quote information and that summary sheet, went over it in detail, checked back with them a week to ten days later to see if they had any issues.  Four different times.

Harrell testified that he first heard that Hessler and Lewis were about to sell National in August of 2007 when he heard rumors that they were talking to Hal Wagner.  The sale was confirmed to Harrell in December of 2007.  National became known by the terms 'Oldco,' which represented the business under Lewis and Hessler, and 'Newco,' which was the business under the new owner, Hal Wagner.

Harrell testified that the total balance due to Advanced from National at the time of trial was $365,371 plus interest.  Advanced also requested attorney's fees pursuant to the Personal Guaranty signed by Lewis.  Harrell reiterated that the price Advanced charged National never was changed from the price quotation given to National in September of 2002.

Ronnie Jay Perkins ("Perkins"), the operations manager of National, testified at trial.  He stated:

Every month [Advanced] would send us a monthly invoice on what we commonly referred to as a green bar, which is a detailed listing of every package that they had produced by type and then come to a total amount due. It was a very detailed report that would list out almost every single cost that was included.

Perkins testified that during late 2007 and early 2008, he prepared a spreadsheet based on summaries of the invoices from Advanced for the years 2002, 2003, 2004, 2005, 2006, and 2007. After he reviewed the invoices they were "put in a tub and given to Michael [Hessler] and/or to Harold [Lewis] for storage with what we call the Oldco, the old company's records."

Lewis testified at trial, and when asked if Advanced's pricing became an issue, he stated:

Yeah. I was constantly called by Gene [Harrell] saying, Hey, Buddy, you've got to help me out here, you're the only company I've never raised prices, I could really use the increase, you know, costs are higher. I said, Gene, I can't go higher than the 60 cents that we're paying a sheet.

Lewis stated: "And we never doubted - - and I'll say it here under oath - - the amount of quantity of packages. If he said we had 2000 packages, we had 2000 packages. It was the pricing. There was no consistency."

Lewis insisted:

We never had any signed agreement. I mean, Gene [Harrell], you know, all during the course of period of time would always send me an e-mail saying, Hey, this is my new pricing.

And I'd say, Gene, you know, I'm not going to accept this.

Come on, Buddy, I need your help over here. All right, you're still the same guy, never change prices. I'll get back to you in another six months, but I'm going to get back on this.

I said, Gene, you know me, I'm not going to let you win this one. I'm not increasing our prices. We cannot do it.

With regard to the sale of National, Lewis testified:

We sold the company. We actually closed on the company on January 2nd, sold the company in November, and, you know, told - - Gene [Harrell] knew about it I guess a day afterwards and called me up and, Congratulations, I know you've been trying to sell for a long, long period of time, which, you know, I'm sure he could tell you, and he came down there.

And, again, in the sports business, in January I'm on the road because we have all the college all-star games. In February we have a thing called the combine. I said, Gene, right after the draft we can get together and let's figure this thing out and come up with whatever is fair. In the meantime I'll have Ron put together all the numbers for you and find out what are the discrepancies, the big discrepancies - - and I don't believe Ron even came close to going over each and every column.

And Gene was supposed to come over in the morning and he showed up the night before. And Mike, Michael Hessler, my partner, said, Hey, Gene's here tonight. He was hoping to get out early in the morning; can you see him tonight? And I said, No problem. Have Ron give me everything so I don't walk into a hornet's nest and I know what we're talking about.

* * *

Then we met with Gene afterwards. And, let's see, the meeting was unfortunately not good. I said, Gene, you know we would never do anything to hurt you. You know our relationship. But there's these discrepancies. I'm not going to go line for line, Gene, just the bottom line is, You know what our price we always agree on. You and I agree on the same thing here, that you have never increased my prices from 2002 to current, but these don't reflect that. We were paying by unit prices, not a package. It was what we wanted in there. We had to keep it a certain number. What is all this stuff?

And Gene was there with his son and he says, Well, what do you say you only owe us? And I said, Gene, I believe that if we go over each and every column, unfortunately, you may owe us. We're not going to do that, we want to leave off in great terms, and we offered him money at that particular time so this would never happen here today.… I don't remember the exact number. I said, Gene, you know, give you $50,000 right now. You know, I'll do everything in my power to get the other guy who bought our company to continue doing business with you.

He was a little bit upset about that because the other guy bought lab equipment and Gene was - - the guy was going to lose his butt on that because nobody can make money on that deal and he needs to come to me. I said, Gene, I'll try to help you in any way I can.

Lewis was asked if he sold National and left it with no assets to pay its bills, and he finally stated:

We kept the company and the checking account open for a period of time to make sure that every customer or employee's check was cashed and we kept it open for a period of time in case there was a printing company that said we had an outstanding bill - - whatever it was, we had it. After everything was done after so many months well afterwards is when that whole entity was shut down to nothing.

After that happened, I met with Gene Harrell again in my office to resolve it. Never to hurt him or to cheat him, only to pay what was a fair number of what we owed.

Lewis also was questioned about the fact that he and Hessler took the four million dollars from the sale of National and put the money into their personal accounts. When asked why he didn't leave some money in a company account until the dispute with Advanced was resolved he stated:

I think an idiot would do that. I don't think you would do that.… Oldco was in existence - - Oldco shut down - - I'm trying to think of the exact date for you. Our last day of doing business at Oldco, the last store we opened up was in the beginning portion of November, and all we were allowed to do was clean up that business. So if it was a three phase operation, we could photograph those customers that we sold, show the packages. After that, Oldco was shut down. There was no business. We had a contract that says noncompete. There was no reason for it to be open any longer.

However, we left the checking account open in the event that any other people that had, Oh, I forgot to cash my check, or, I need this, or whatever it was, it was there. And we don't have, as I know of right now, a person that says that we owed them anything except for Mr. Harrell, which we knew about.

And with the sale of our company, okay, we even acknowledged that,

when they ask you on the sale if you have any, you know, debt or, you know, liabilities or whatever, we said, yes, we have a situation going with our lab where they think that we - - they owe us some money and we believe that it is a very minimal amount of money.

When asked if he hired an accountant to review the invoices that National claims are wrong, Lewis stated:

I don't need to because we know where now the problem lies.

* * *

Mr. Perkins was only trying to show during that period of time for Mr. Harrell of how much money that we were overcharged.

But if we could go backwards, it's a simple formula, and be charged exactly what we agreed to pay only, not a penny more, of 60 cents a unit and subtract it, the difference what he was charging us per unit, and just show you how sometimes a drip and a force can flood your house, these pennies, two cents difference, three cents difference, if we are photographing 4,000 people on the average a week and we have 15 sheets of paper per customer and it's a difference of three cents a sheet of paper only, that's 45 cents a customer, that's - - what is that? 18 - - what would that be? $1,800 a week? Basically 100,000 a year?

Well, if we did that and he overcharged and we just calculate the year 2002, '3, '4, '5, '6, and '07, six years, we basically overpaid 700,000 because the pricing wasn't right. So we didn't need an accountant. We found the problem. It's right in front of us. It's a simple thing.

When asked about the number of sittings, Lewis was unable to tell the number of sittings involved. He stated that "the sittings never came up of how many sittings we photographed." He also stated:

The amount of sittings, getting to your question of the overcharge, it's a simple thing to figure how many photographs of families we photographed in 2002, '3, '4, '5, '6, and '7 and how much we were overcharged on each customer. That is what we found out the problem was, and it's a simple thing.

Now, we weren't going to Gene [Harrell] to ask us, Gene, you owe us

-11-

money.  We were trying to resolve this as the relationship that we had and trying to keep it very civil and very friendly.  And that's what that meeting was about, to try to get it done.

Lewis further stated:

Again, we figured out, we knew where the problem was.  We didn't have to break down every sitting.  If I did that, today we'd be actually doing a countersuit against you and asking you for all the money.  It wasn't that.  We just wanted to resolve it with Gene.  And as I think you would know, all along, even in your relationship with us, we have always been trying to do that.

Lewis was questioned about Perkins' testimony, and when asked why he waited until the Thursday before trial to try to make arrangements for Perkins to testify, Lewis stated:

I don't know.  I mean - - you know, I just think the thing is a lot simpler than we're making it out to be here today, to be honest.  I mean, we know where the problem was.  We know that - - you know, we never had a price increase for 2002 to ever.  We knew what we were supposed to be paying.  He found out where the problem was; and, to be honest, I never thought we'd be sitting here in court today.

Lewis admitted that Harrell sent him the price list and that despite his saying that he couldn't pay those prices National continued to place the orders with Advanced. When asked if he was claiming that Harrell defrauded them on any of the charges, Lewis stated: "I've never said that all along.  I'm not arguing even - - I'm taking his word.  If he said he shipped out 2,187 pieces, then I'm taking his word he shipped out 2,187 pieces.  But we finally found where is this discrepancy happening here."  When asked, Lewis admitted that it is his signature on the Personal Guaranty.

Hessler testified at trial that he and Lewis opened National in 1984, and sold the business in 2007.  Hessler worked in the business during that entire time.  When asked whether the Advanced bill was paid incrementally or based on invoices, Hessler testified:

We always paid our lab bill based on invoice.  When the invoice came in, our accounting department would go through a checking process where they checked the quantity.  And we could always check the quantity because we knew how many families were photographed in that store.  So we checked the quantity, we checked the pricing, and we would pay based on the invoice.

He stated, however, that this process changed in late 2001 or early 2002, and further testified:

> [W]e could always still check the quantity, but the cost or the price that we were being billed was wrong, so it became impossible to continue paying based on invoice.
>
> So at that time Gene Harrell was our contact, our rep. We told him we didn't agree with it, the amount, and we agreed that we'd try to get it fixed. But we didn't want to fall behind in payments, so at that point we quit paying based on invoice and started paying just a lump sum, which was typically $25,000 every approximate two weeks or $35,000 every two weeks.

Hessler stated that Lewis would have been the person who had to okay a price change from a vendor.

> Hessler testified:
>
> As we were getting close to selling the company, it was time to get this thing finally figured out and cleaned up. So I asked Ron Perkins to prepare a schedule that - - I told him to go back to the actual invoices - - or the lab had two things. They had what they called green bar sheets and then I think they had a regular invoice. I think the way it worked is the green bar would accumulate all the packages of portraits by package type, where I think the invoices were more either identified by customer or by store. So Ron took those green bars and he went back all the way to 2001 and 2002.
>
> First he came to me and he said, Mike, I could work on that for years. I can't - - it's going to take forever. So I told him, Ron, do this then: Take just the top six or seven products, the things we bought the most of, and only concentrate on those six or seven items. We know we're billed at something different than what we've agreed to pay to [sic], so what I want you to worry about, Ron, is get the quantity - - because we agreed with the quantity. We didn't have a problem or quarrel with the quantity - - put the quantity we bought of each of those six or seven packages and then put what we were charged and then compare that to the 60 cents we agreed to. And he put together a schedule for that.

When questioned, Hessler admitted that they did not furnish the documents that support the work that Perkins did, even though those documents were requested by Advanced during this suit.

Hessler admitted that he and Lewis each took their share of the proceeds from the sale of National and placed the money into their own respective personal trust accounts. He also admitted that they are being sued by the attorney who represented them during the sale of the company for non-payment of the attorney's fee. Hessler stated:

> The lawyer who represented us in the sale of our company charged us over $100,000 and the lawyer who represented the company who bought us only charged about $38,000. And the lawyer who represented Hal Wagner in buying us drew up the contract; our attorney reviewed the contract. We didn't think it's fair that he is charging three times what the other attorney charged and the other attorney is the one that did the bulk of the work: He drew up the contract.

Hessler admitted that he never put anything in writing objecting to Advanced's prices, but merely told Advanced after National had received the invoices that they would not pay those prices. He testified:

> The way our pricing all came about is back in 2000 or 2001 we were ordering Package A, the eight fifty package. That package, if you look at it on a unit price, it's about 56 cents per unit.
>
> After that, Gene [Harrell] introduced Package B to us, which was a sepia product. The sepia product, I think on a unit product, was 62.7 cents per unit. Our accounting department, which was headed up by Patty Midkiff, was telling us it was very difficult to audit those invoices.
>
> * * *
>
> To make a long story short, so Patty Midkiff said it was very difficult to try to audit these invoices. So Patty Midkiff and Harold Lewis had a phone conversation with Gene Harrell discussing how do we make this a simpler process because it was taking forever to try to audit it.
>
> Out of that meeting a compromise was made. The color portraits were 56 cents, fifty-six point something cents. The sepia was 62.7 cents and a compromise was made at 60 cents.
>
> At that time we were probably doing about 60 plus percent of our business was color and 40 percent was the sepia. So, in a sense, those two numbers were added together and they came up with the 60 cent as the

-14-

compromise price. So rather than this one be one and this one be another, it'd be 60 cents per unit for each.

Hessler testified that the first time he became aware that Advanced was charging National for retouching was the week before trial. When asked if he believed that National had a contract with Advanced, Hessler stated: "No."

After trial, the Trial Court entered its Final Judgment on September 30, 2009 based on the jury's verdict finding, *inter alia*, that Advanced had a contract with National, that National had breached the contract, that Lewis had a contract with Advanced providing his personal guaranty to pay National's debt, and that Lewis had breached his contract of personal guaranty. The Final Judgment awarded Advanced judgment against National and Lewis jointly and severally in the amount of $400,526.70, and judgment against Lewis solely in the amount of $54,806.00 as attorney's fees as provided for in the Personal Guaranty. National and Lewis filed a motion for a new trial, which the Trial Court denied. National and Lewis appeal to this Court.

## Discussion

Although not stated exactly as such, National and Lewis raise two issues on appeal: 1) whether there was material evidence to support the jury's verdict that Advanced and National had a contract, including price, and that National breached that contract; and, 2) whether there was material evidence to support the jury's verdict that Advanced and Lewis had a contract of Personal Guaranty and that Lewis breached that contract.

As our Supreme Court has instructed:

An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict: (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their

constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009).

We first consider whether there was material evidence to support the jury's verdict that Advanced and National had a contract, including price, and that National breached that contract. As our Supreme Court has instructed:

A contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (citations omitted). In determining mutuality of assent, courts must apply an objective standard based upon the parties' manifestations. *T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002).

*Staubach Retail Services-Southeast, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005). In *T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, this Court further explained:

Assent can be established by the course of dealing of the parties. *Remco Equip. Sales* [*v. Manz*, 952 S.W.2d 437] at 439. In determining whether a contract exists, the court also can consider relevant evidence such as whether the parties performed under its terms. 1 Williston & Lord, § 30:3. When a party who has not signed a contract has nonetheless manifested consent by performing under it and making payments conforming to its terms, that party is estopped from denying that the parties had a meeting of the minds sufficient to bind them to the contract. *R.J. Betterton Management Serv., Inc. v. Whittemore*, 769 S.W.2d 214, 216 (Tenn. Ct. App. 1989).

*T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002). "The parties' actions or inactions, as well as spoken words, can establish mutual assent." *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007).

National and Lewis argue on appeal that there was no meeting of the minds, and hence no contract, because National disputed the prices that Advanced was charging. The jury heard evidence, however, that Harrell had provided National with the price quote in 2002 and that this pricing never changed. The jury also heard Harrell testify: "I didn't hear any conversation in the year 2003 or 2004 about pricing being incorrect. In 2005 I would

say, yes, I don't remember the date, but Harold [Lewis] said something's wrong with the billing." Furthermore, the jury heard evidence that despite voicing objections to the pricing, National continued to place orders with Advanced every week as had been the usual course of business between these parties.

A "parties' actions or inactions, as well as spoken words, can establish mutual assent." *Moody Realty Co., Inc.,* 237 S.W.3d at 674. There is, at a minimum, material evidence in the record to support the finding that National consented to the pricing, and, therefore, there was a meeting of the minds. Taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and discarding all countervailing evidence, as we must, we find that the record contains material evidence to support the jury's verdict that a contract existed between Advanced and National. We affirm on this issue.

We next consider whether there was material evidence to support the jury's verdict that Advanced and Lewis had a contract of Personal Guaranty and that Lewis breached that contract. Lewis raises two arguments with regard to this issue. First, Lewis argues that he did not consent to assignment of the Personal Guaranty. The Personal Guaranty was introduced as an exhibit at trial. By its own terms, the Personal Guaranty provides:

> This Guaranty shall bind the undersigned, his heirs, personal representatives and assigns, and the rights and privileges of Coppinger hereunder shall inure to the benefit of its successors and assigns, and this Guaranty shall be effective with respect to loans or advances made by Coppinger's successors and assigns to Borrower.

Thus, the jury had before it material evidence to support a finding that the rights and privileges under the Personal Guaranty would inure to Coppinger's successors and assigns.

Second, Lewis argues that Advanced is not a successor or assign of Coppinger. The jury heard Harrell's detailed testimony regarding the various transactions linking Coppinger to Advanced. Considerable documentary evidence of these transactions was introduced into exhibit at trial. Thus, there is material evidence in the record to support the jury's finding that Advanced is a successor or assign of Coppinger.

Taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and discarding all countervailing evidence, as we must, we find that the record contains material evidence to support the jury's verdict that Advanced

and Lewis had a contract of Personal Guaranty and that Lewis breached that contract. As such, we affirm on this issue.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants National Studios, Inc. a/k/a NSI Closeout, Inc., and Harold C. Lewis, and their surety.

_____
D. MICHAEL SWINEY, JUDGE