NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0340n.06

No. 17-6205

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

KUTITE, LLC; MOHAMMED Z. KUTITE,    )
                                    )
    Plaintiffs-Appellants,          )
                                    )
v.                                  )
                                    )
EXCELL PETROLEUM, LLC; MAJORS       )
MANAGEMENT, LLC; SHELBY DRIVE 3796  )
CENTER, LLC,                        )
                                    )
    Defendants-Appellees.           )

**FILED**
Jul 05, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF TENNESSEE

Before: WHITE, DONALD, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Mohammed Kutite and Kutite, LLC, of which Mr. Kutite is the sole member, sought to lease a gas station owned, managed, and supplied by the defendants. The process hit a snag, however, when the parties disputed whether Kutite had to sign an agreement to use an ATM already present in the store. The relationship never recovered, leading Kutite to file this suit. Ultimately, the district court found for the defendants, and for the reasons stated, we AFFIRM.

## I.

In 2012, Kutite sought to take over an Exxon gas station and store in Memphis, Tennessee, by way of assignment from the then-current lessees, Azel Investment Group, Altareb Dahan Mahmoodnaji, and Mutahar Muhammed Sharhan (the Assignors). The defendants are the fuel supplier for that station, Excell Petroleum, LLC; the manager of the premises, Majors

Management, LLC; and the landlord of the premises, Shelby Drive 3796 Center, LLC. After speaking with the Assignors about taking over their lease of the store, Kutite approached Dustin Hewatt, the son of the principal of Majors Management, about getting approval to operate the store. Mr. and Mrs. Kutite passed a credit and criminal background check.

On September 6, 2012, Kutite signed a Lease Agreement and Bill of Sale with the Assignors that was conditioned on the final approval by the defendants. These documents obliged Kutite to pay the Assignors $50,000 for "good will"—Kutite had already paid half—as well as the cost of the store's inventory and fuel. The remaining $25,000 for goodwill was due on or before October 1, 2012, the closing date listed in the agreement.

On September 27, 2012, Judy Fawbush, a Majors Management employee, sent Kutite five documents: the Assignment of Agreements, the Amendment to Memorandum of Agreement, the Lease, the First Amendment to Lease, and the Contract Supply Agreement. Kutite was told he had to sign, notarize, and return the Assignment of Agreements, which assigned the Lease to Kutite, and the Amendment to Memorandum of Agreement, which assigned the Contract Supply agreement to Kutite (collectively, the Assignment Documents). An email sent by Fawbush to Kutite asked Kutite to return the signed, witnessed, and notarized documents and stated "[o]nce Scott Moon signs, we will send you and the assignor a copy of the Assignment of Agreements." Moon is the Executive Vice President and Manager of Majors Management, and the Manager of Excell and 3796 Center. Kutite and the Assignors signed and notarized the documents and emailed them to Majors Management on September 28, 2012. The Assignment Documents contained blank spaces for Moon to sign, but there are no copies of the Assignment Documents in the record

that include his signatures. The Assignment Documents state that they are "entered into this 21 day of September, 2012, and made effective as of October 1, 2012."[1]

On October 2, 2012, Kutite began operating the store. That same day, however, Katie Clink from Majors Management emailed Kutite, explaining that the assignment of the premises was not complete until Kutite signed the "Assignment and Acknowledgement Agreement Regarding Exclusive ATM Agreement." According to Clink, "[o]nce we have that, I'll get the landlord to sign the assignment and get a copy to you." The ATM Agreement required Kutite to use the ATM that was already present in the store and accomplished this goal by assigning the existing ATM agreement between the Assignors and the ATM owner, Tennessee Management, to him. Kutite balked and would not sign the ATM Agreement. Majors Management Field Representative Karl House had told Kutite early in the process that he could install an ATM of his choosing in the store. But House also testified that, at that time, he thought Kutite could choose his own ATM because Kutite had told House that he had a lease with the defendants, so House "assumed that the previous lease was voided and not in play anymore . . . and not amended." Nonetheless, because Kutite did not sign the ATM Agreement, the defendants never signed and returned the Assignment Documents. Roughly two weeks after learning of the issue with the ATM Agreement, Kutite entered into an agreement with a different ATM company to provide an ATM for the store. On November 8, Majors Management again told Kutite that it was holding the final Assignment Documents until it received the signed ATM Agreement.

---

[1] We note that the dates are handwritten. It is unclear who added the dates and when. The only information we have is from an email exchange between Fawbush and another employee, Katie Clink. Clink wrote, "We may need to get something else signed before we give these back to the tenant, so don't send them out until I've given final approval. Do you know when they're supposed to take over? Joe emailed me today saying that he had a note it was today, but I hadn't heard anything." Fawbush responded, "I don't know when—I left the effective date blank and they (assignor and assignee) did, too."

Still, Kutite operated the store, paying rent for four months, which the defendants accepted, and purchasing fuel from Excell. Kutite stopped paying rent in February 2013 and last purchased fuel in June 2013. There is some dispute as to exactly what happened, whether Kutite went on vacation, or whether he abandoned the store, but the last day Kutite was in the store was September 24, 2013.

On February 8, 2013, Kutite filed a complaint for injunctive relief and money damages in Tennessee state court, alleging several claims, including breach of contract, promissory estoppel, tortious interference with contract, and usury. Kutite sought compensatory damages, lost profits, and punitive damages. The defendants filed a counterclaim for damages allegedly caused by Kutite. On February 19, 2013, the defendants removed the case to the federal district court.

After a series of motions and discovery requests, the parties both filed motions for summary judgment on July 22, 2015. Over a year later, on August 24, 2016, the district court entered an order denying in part and granting in part the cross-motions for summary judgment. On the breach of contract claim, the district court found that the parties never reached a meeting of the minds and never executed a formal written contract because of the disagreement over the ATM. But the court found that genuine issues of material fact remained on the promissory estoppel claim.[2] The court further found that genuine issues of material fact remained on compensatory damages and lost profits, but that punitive damages were not available for Kutite.

The court set a trial date. But before that trial could happen, the defendants filed a motion for clarification and reconsideration of the court's order granting in part and denying in part the motions for summary judgment. The defendants focused their attention on promissory estoppel,

---

[2] The court granted summary judgment to the defendants on Kutite's tortious interference with contract and usury claims. These claims are not at issue on appeal.

asking the court to reconsider its decision on that claim. The district court canceled the trial and instead held a hearing on the defendants' motion.[3] On the second day of the hearing, the court orally granted the defendants' motion for reconsideration and summary judgment.

The district court followed up with a written opinion on September 11, 2017. The court again held that no valid contract existed, but this time found that estoppel should not apply to create an agreement where there was not one. After discussing damages, the court concluded that "[d]efendants are entitled to $85,184.12 in rent and [maintenance] charges. Defendants['] request for $44,462.51 in security guard fees is reduced to $13,915.71. Plaintiffs are awarded an $11,000 setoff for illegal overdraft fees. Accordingly, Plaintiffs are ordered to pay Defendants [$]88,099.83 in damages." Kutite timely appealed.

## II.

*Enforceable Contract.* Kutite contends that the district court erred by concluding that no enforceable contract existed between the parties. Establishing the existence of a valid contract is the first step to a breach of contract claim under Tennessee law.[4] *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). "Every contract results from an offer and the acceptance thereof." *Sutton v. First Nat. Bank of Crossville*, 620 S.W.2d 526, 532 (Tenn. Ct. App. 1981). The offer and acceptance show the necessary meeting of the minds between the parties to form a contract. *Id.*; *see also Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*,

---

[3] We confess to being confused by the nature of this hearing. It was, in essence, a trial, as it spanned two days and several witnesses testified. Although counsel at argument before this court admitted to likewise being confused by the event, neither party objected to the process or to the court's decision to resolve the case on summary judgment grounds after such a hearing.

[4] In its report and recommendation, the magistrate applied Georgia law when discussing whether an enforceable contract existed. Although the district court adopted the report and recommendation, the district court applied Tennessee law throughout the remaining proceedings, and the parties discuss only Tennessee law on appeal.

160 S.W.3d 521, 524 (Tenn. 2005) ("A contract must result from a meeting of the minds of the parties in mutual assent to the terms . . . .") (quotation marks omitted). "In determining mutuality of assent, courts must apply an objective standard based upon the parties' manifestations." *Staubach Retail*, 160 S.W.3d at 524. Contracts "can be expressed or implied, written or oral." *T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 865 (Tenn. Ct. App. 2002). "A written contract does not have to be signed to be binding on the parties." *Id.* "Similarly, when an agreement is reduced to writing but is signed by only one of the parties, it is binding on the non-signing party if that party has manifested consent to its terms." *Id.* at 865–66.

Kutite first argues that the parties entered into a formal contract on September 28, 2012, when he executed the documents sent to him by the defendants and returned them to Majors Management. Kutite, in other words, conceives of the defendants' sending of the documents as an offer, and his signing and return as acceptance. And because, in Kutite's view, a contract was formed on September 28, the defendants could not later add additional terms, like the ATM agreement. We disagree that the documents sent to Kutite constituted an offer that he could accept by signing and returning[5] and that a contract was formed on September 28. The ultimate acceptance of the deal hinged not on Kutite signing and returning the documents, but on the defendants' final indication of assent. Several reasons support this conclusion.

First, as background, there can be no question that Kutite was on notice that the assignment of the lease on the store was contingent upon the defendants' approval. The relevant documents conditioned the completion of the assignment from the Assignors to Kutite on the final consent of

---

[5] *See* 21 Tenn. Prac. Contract Law and Practice § 4:14 ("An offer creates the power of contractual acceptance in the offeree. Similarly, the *Restatement (Second) of Contracts* characterizes an 'offer' as one party's manifestation of willingness to enter into a bargain that justifies another party in understanding that its assent to that bargain is invited and will conclude it.").

the defendants. For example, the Lease Agreement between 3796 Center and the Assignors, which Kutite sought to take over, stated that the Assignors "may not assign or sublet this Lease or any interest hereunder, or sublet the Premises or any part thereof, or permit the use of the Premises by any party other than Tenant, without the prior written consent of Landlord, which shall be at Landlord's sole and absolute discretion." The Fuel Supply Agreement between Excell and the Assignors states that the Assignors "shall not assign this Agreement in whole or in part without the prior written consent of [Excell]. Such consent may be withheld if [Excell] determines that the proposed assignment is not in its best interest." The defendants' consent to the Assignment of Agreements was premised on the Assignors and Kutite agreeing "to execute any necessary documents in order to secure Landlord's interest in the Lease or other Agreements." And even the Agreement and Bill of Sale between the Assignors and Kutite conditioned the agreement "upon final approval of the sub-lease from Sellers to Buyer by [defendants]." So Kutite knew that he needed the defendants' approval for the lease assignment to be final. Whether he got that approval depends on whether a contract was formed with the defendants when, on September 28, he executed and returned the documents they had sent him the day before.

The documents Fawbush emailed to Kutite on September 27 contemplated that they would be signed and notarized by all parties.[6] As sent to Kutite, the lines for Scott Moon to sign, as Manager of 3796 Center and Excell, and the corresponding notary spaces were left blank, indicating that Kutite was to execute the documents first with the defendants to follow. Fawbush's email to Kutite also expressed this understanding. Fawbush asked Kutite to sign the documents,

---

[6] The Assignment Documents conclude: "**IN WITNESS WHEREOF,** the Assignor, Assignee, Landlord, and Supplier have caused this instrument to be executed under seal on the day and year first above written," followed by blank lines for the signatures of all the relevant parties and for the notary.

have them notarized, and send them back to Majors Management. She then wrote, "Once Scott Moon signs, we will send you and the assignor a copy of the Assignment of Agreements."

The relevant documents and Fawbush's email, therefore, make clear that final acceptance needed to come from the defendants after Kutite signed and returned the documents. The testimony of Benjamin Smith, Chief Administrative Office of Majors Management, confirms that it was the defendants' regular practice to indicate their acceptance last. He testified that it is often the case that after Majors Management sends the lease documents to a future tenant, the tenant makes edits to the document. He then explained:

> [I]f we decide to do business, then, you know, we would circulate documents, as we were discussing, and eventually those would become final and they would be sent first to the perspective tenant for their signature and then we always . . . want to control the process and we don't want someone coming back to us and saying, hey, you know, we thought we had an executed agreement when . . . there wasn't one, so we are always the last one to sign an agreement. That's . . . by design so that we always can be certain when an agreement is executed by us that it is fully executed.

When asked whether Majors Management has "a practice of verbally agreeing [to] leases . . . without entering into a written fully executed lease," Smith responded, "No. For a number of reasons that's problematic."

Smith's testimony comports with the conclusion we derive from the relevant documents and from Fawbush's email—Kutite's executing and returning the documents was not the last step to finalizing the parties' agreement. Instead, no agreement would be reached unless and until the defendants indicated their final approval.

Kutite counters that even if no contract was formed when he sent the documents to Majors Management on September 28, a contract was nonetheless formed thereafter. Kutite claims that documents produced in discovery prove that Moon did sign the documents Kutite had returned and that, upon Moon's signature, the defendants had accepted the agreement. Again, we disagree.

Kutite points to an internal email discussion between Majors Management employees, Fawbush and Clink, on October 2, 2012. Clink wrote, "Did the new tenant sign anything yet? I think you emailed the agreement to him. . . ." Fawbush responded, "Yes, I've got the signed documents and Scott has signed them. Just need to get them notarized on our end. What is the effective date?" Clink responded, "We may need to get something else signed before we give these back to the tenant, so don't send them out until I've given final approval." That something else was the ATM Agreement. While this exchange is evidence that Moon did sign the documents, signing alone is not enough. It is well-settled that a contract "is not binding until its acceptance is communicated to the other party." *Cole-McIntyre-Norfleet Co. v. Holloway*, 214 S.W. 817, 818 (Tenn. 1919); *see also* 2 Williston on Contracts § 6:5 (4th ed.) ("It is often said that the offeror must receive notice of acceptance as a prerequisite for completion of a contract.").

Here, all sides agree that the signed documents were never sent to Kutite. Not until discovery in this lawsuit did Kutite have any indication that Moon might have signed the documents. Kutite's argument that Moon's signature alone could create an acceptance of the offer fails. Communication of an offer's acceptance is a critical step in contract formation. *Cole-McIntyre-Norfleet Co.*, 214 S.W. at 818.

The defendants did not need to indicate their acceptance in writing, however. In some circumstances, verbal assent, or even contract performance can indicate a party's intent to be bound. *See id.* ("The acceptance, however, of such an offer, may be communicated by the other party either by a formal acceptance, or acts amounting to acceptance."); *see also Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) ("The parties' actions or inactions, as well as spoken words, can establish mutual assent."). But here there is no indication that the defendants communicated assent to the agreement orally. Instead, after determining internally that

the agreement was not satisfactory without the ATM agreement, on October 2, Clink informed Kutite: "There is one additional document we will need before we can complete the assignment [the ATM Agreement]. I tried sending it earlier, but I think it bounced back. . . . Once we have that, I'll get the landlord to sign the assignment and get a copy to you." Kutite acknowledges that he received the ATM Agreement from Clink on October 2, 2012. Internally, the defendants continued to recognize that the agreement had not been finalized. In an October 3, 2012 internal email, Clink wrote, "I sent the assignor an email yesterday with that atm doc to sign. If I don't hear from him today, I'll call him tomorrow." Clink wrote another email to Fawbush on October 9, 2012, stating, "I've called and left 2 messages and emailed him the document he needs to sign. I guess we just don't sign this assignment until we get that ATM assignment agreement." And then, on November 8, the defendants again informed Kutite that there was no finalized agreement. Fawbush told Kutite that the defendants were still holding the documents because, as she said, "I was told to hold the documents until we get the signed ATM Agreement."

Kutite testified that he knew that without him signing the ATM Agreement, there was no contract. The following colloquy between the court and Mr. Kutite occurred:

Q. The first you know about the ATM Agreement for the ATM that was in the business was October 2nd?

A. Correct.

Q. I think the communications to you, either on that date or shortly thereafter, indicated that essentially you had no agreement?

A. Yes.

Q. Unless you entered, you know, unless you took on that ATM there?

A. Correct.

. . .

Q. Email on October 2nd as well as November the 8th?

A. Correct.

Q. . . . I guess my concern is before entering into the new ATM agreement, why didn't you get to the bottom of it? . . . Why didn't you stop what you were doing until the agreement as far as the ATM was . . . decided. I don't understand why you kept on.

A. Because nobody mentioned. . . . I have everything going smooth and I have all the documentation he signs and all the correspondence back and forth, it was go further until I start working in the store.

Q. I understand you're in the store. But you received from Ms. [Clink] the e-mail on October the 2nd?

A. October the 2nd, yes.

Q. You never received the agreements back from them, back from Majors?

A. Because I didn't know that . . . they leave agreements or they hold until I have to sign them, ATM machine, nobody told me about it. The ATM machine agreement it wasn't part of the deal when I discuss with Mr. Dustin from the beginning.

Even when they email me all the five documentation, the first email, it wasn't including the ATM machine. . . .

Q. . . . [B]ut as a businessman you know that you really don't have an agreement until you get the signed documents back from the other side?

A. . . . [T]hat's true. And actually, I was waiting, waiting until they send me that.

Q. I understand. But she let you know on October 2nd, even though it wasn't brought up before, that there was another agreement?

A. I was already in the store running the business.

Q. I understand that.

A. Yeah, yeah, but still all this agreement and my point is the ATM Machine, it wasn't actually part of the deal from the beginning.

. . .

Q. But you did know as of October the 2nd that was part of the deal?

. . .

A. That's the first time we know that from them, yeah.

Q. And so it came down to you, didn't it, to either accept it or not?

A. When it came down to me, I was asking them why I have to –

Q. I understand you asked them that, but the bottom line is, if that's a part of the agreement and you don't agree to it, then there is no agreement at all.

And I'm trying to understand why you stayed in business and continued to try to operate it when you didn't have the agreements?

A. But I don't have the agreement because I was waiting on them. I signed, I sent everything to them and they didn't send it back to me.

Q. But they told you on a couple of occasions that they were not going to send the agreements, didn't they?

A. They didn't send the agreement until I signed the ATM Machine.

. . .

Q. Okay. Ms. [Clink] said on October 2nd and also November the 8th that if you don't, basically if you don't sign the ATM agreement, we don't have an agreement at all, that's what she was saying. Am I . . . correct in that?

A. Yes, yes, Your Honor, yes.

In sum, the defendants did not communicate acceptance of the agreement, either orally or by returning the signed documents to Kutite. Instead, the defendants' consistent communication with Kutite in the weeks after he signed and sent the documents to the defendants informed him that there would be no final contract until Kutite signed the ATM Agreement, which he never did.

Nonetheless, Kutite relies on *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666 (Tenn. Ct. App. 2007), to argue that a valid contract was formed. He claims that under *Huestis,* a valid contract was formed when he signed and returned the documents which Majors Management had drafted and sent to him. Alternatively, he argues that the defendants indicated their acceptance of the agreement by performing under the contract.

In *Huestis*, the Huestises sought the help of Moody Realty in buying a dairy farm. *Huestis*, 237 S.W.3d at 669. Moody showed the Huestises a few farms and that same day presented them with a standard Buyer's Representation Agreement. Mr. Huestis signed the agreement. Moody's agents eventually signed the contract, but they did not sign it in the presence of the Huestises. The question was whether the parties had reached an agreement that day that precluded Mr. Huestis from purchasing a farm without the assistance of Moody. The Tennessee Court of Appeals found that "the record supports a finding of mutual assent to be bound even assuming the agents did not sign the agreement in front of Mr. Huestis." *Id.* at 675. According to the court, "[w]hen only one party signs a written contract that contemplates the signatures of both parties (but does not expressly require it), the law considers it to bind both parties when the non-signing party accepts it." *Id.* The question was whether Moody sufficiently manifested its assent to be bound. The court said that the evidence was clear that Moody had manifested its assent, giving four reasons for this conclusion: (1) the agents told Mr. Huestis they did not need to sign the contract, which the court interpreted as indicating to Mr. Huestis that they had already agreed; (2) the agents themselves had drafted the contract language; (3) the agents began to perform under the contract by showing Mr. Huestis an unlisted farm; and (4) subsequent telephone calls confirmed that the agreement was valid. *Id.* at 675–76.

*Huestis* does not stand for the proposition that a valid contract is always formed once the drafting party receives an executed copy of the contract from the other party, even if the drafter has not signed it. Rather, the question in *Huestis*, as here, was whether the nonsigning party had otherwise evidenced mutual assent. *Huestis* does show, however, that, even in the absence of a signature, the nonsigning party's conduct can establish mutual assent. *See also Murray v. Grissim*,

290 S.W.2d 888, 890 (Tenn. Ct. App. 1956) ("While a contract (offer and acceptance) is usually expressed in words, it may be implied from conduct.").

Kutite argues that, just like in *Huestis*, the parties' conduct here shows mutual assent to the terms of the contract. There is no dispute that from early October 2012 until early February 2013, the parties operated under the terms of the contract.[7] Kutite operated the store, bought gas from Excell, and paid rent, all as set forth in the terms of the agreements. While this conduct, standing alone, might suggest that the parties were conducting themselves as if they had reached an agreement, it is not the whole story.

We begin by noting that, although the parties vehemently dispute whether their conduct amounted to mutual assent to the terms of the agreement, they largely do not contest the underlying facts. And in Tennessee, where no genuine issues of material fact exist, "[t]he determination of whether a contract has been formed is a question of law." *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009); *see also Jones v. LeMoyne-Owen College*, 308 S.W.3d 894, 904–06 (Tenn. Ct. App. 2009) (affirming in part grant of summary judgment on a breach of contract claim because "the parties' undisputed conduct and the surrounding circumstances in this case . . . show a lack of mutual assent").

As noted previously, on October 2, 2012, Clink told Kutite that there was no agreement until he signed the ATM Agreement. Yet, despite knowing that the defendants had hinged their approval of the agreement on his signing the ATM Agreement, Kutite declined to sign it, and instead entered into an agreement with another ATM company. Kutite testified that on November

---

[7] In February 2013, after Kutite filed this suit but before the defendants removed it to the United States District Court, the state court granted a temporary restraining order that required the parties to operate under the lease agreement. Even if the parties had been willingly operating under the lease agreement for the first seventeen weeks, as of February 8, 2013, they were operating under the lease agreement by court order.

2, he had a phone call with Benjamin Smith, in which Smith told him "bottom line is if you didn't sign the ATM Agreement, we're going to kick you out of . . . the store." And then on November 7, Fawbush told Kutite that the defendants were still holding the documents until he signed the ATM Agreement.

Kutite also testified that he was told many times by a Majors Management field representative that he has "no right to be in the store" and that "this is not your store. Why are you here? They're going to kick you out either/or they make a default against you. You have to get out of here." In addition, Kutite acknowledged that even as of January 2013, the defendants did not see him as a tenant: letters regarding the business were sent, not to Kutite, but to the Assignors. He explained: "They didn't send [the invoice] to me. Again, they sent it to [the Assignors] because I will keep saying they don't consider me a tenant so they don't communicate with me." He further testified: "I was operating the premises, but again the Landlord doesn't consider me a tenant. They consider me, I'm just an employee or just someone illegal to be on the premises. He has to leave the premises. That's what I've been told many times." Kutite acknowledged that as of the end of January 2013, he had no lease agreement and that the defendants wanted him off the premises.

If the defendants wanted Kutite off the premises, why then were they selling him fuel and letting him remain in the store? Smith explained that the rationale was two-fold. According to Smith, the defendants at first hoped they could work the issue out amicably, and that either "[the Assignors] or through our own efforts that we could get him to change his mind [about the ATM Agreement]." But when it became clear that Kutite would not sign the ATM Agreement and that no final agreement would be reached between the parties, Smith explained that the issue of removing Kutite from the premises was difficult. Indeed, according to Smith, the original lease

agreement was still in place because there had been no valid assignment to Kutite. Smith testified that the Assignors were reluctant to take back the store and that even if they would, they could not take possession of the store with Kutite operating it. Smith further explained why the defendants operated under the terms of the lease agreement, despite wanting Kutite off the premises: "[O]ur course of conduct on a daily basis is based on the written agreement. So to the extent one doesn't have a written agreement, which I don't believe he did, we don't really know how to act other than what our normal agreement said." Smith agreed with the district court that "as the months went by, it was basically a month-to-month agreement based on the written agreements."

Although we question the defendants' treatment of Kutite throughout this process, we cannot say that, under the law, the parties' conduct amounted to mutual assent to the terms of the contract. *See Staubach Retail*, 160 S.W.3d at 524. Even though the parties willingly operated under the terms of the contract for seventeen weeks, at all times the defendants made known to Kutite that there was no finalized agreement in place and that he could not remain on the premises unless he signed the ATM Agreement. Kutite never signed the ATM Agreement; accordingly, the parties never reached a final agreement on contract terms.

For these reasons, we conclude that no enforceable contract existed between Kutite and the defendants. The district court, therefore, did not err in granting judgment to the defendants on Kutite's breach of contract claim.

*Estoppel.* Kutite argues that even if there was not an enforceable contract, promissory estoppel should prevent the defendants from claiming that no contract existed.[8] The Tennessee Supreme Court explains "promissory estoppel" as follows: "'A promise which the promisor

---

[8] We decline to discuss equitable estoppel, which Kutite mentions only briefly on appeal; Kutite has not meaningfully pursued this claim at any step of the way.

should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982) (quoting *Restatement of Contracts* § 90). But "'[n]o injustice results in refusal to enforce a gratuitous promise where the loss suffered in reliance is negligible, nor where the promissee's action in reliance was unreasonable or unjustified by the promise.'" *Id.* (quoting L. Simpson, *Law of Contracts* § 61 (2d ed. 1965)).

> The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonabl[y] in justifiable reliance on the promise as made.

*Id.* (quoting Simpson at § 61). Generally, Tennessee courts disfavor estoppel. *See Rogers v. Colville*, 238 S.W. 80, 83 (Tenn. 1922) ("Estoppels are not favored in the law.").

Kutite makes two arguments in favor of his promissory estoppel claim. First, he contends that Hewatt's approving him to purchase the store after conducting credit and background checks was a promise on which he relied to believe that an agreement had been reached. We do not doubt that being preapproved to purchase the store could have led Kutite to believe that he would ultimately reach an agreement with the defendants. But Kutite could not reasonably have believed that the successful credit and background checks constituted either a final agreement with the defendants, or a promise that the defendants would allow Kutite to operate the store without further conditions. *See Alden*, 637 S.W.2d at 864. The Agreement and Bill of Sale between the Assignors and Kutite, which Kutite signed after the preapproval process, conditioned the agreement "upon final approval of the sub-lease from Sellers to Buyer by [the defendants]." Therefore, despite the preapproval process, Kutite was on notice that final approval by the defendants was still a prerequisite to the completion of the agreement.

Kutite alternatively argues that the defendants' sending of the five documents to Kutite on September 27, 2012, constituted the promise. He states in his complaint that "[i]n reliance upon representations from the legal department including the five agreements . . . , Plaintiffs paid Assignors $50,000 in September 2012 for the good will value of the store, Plaintiffs executed a $33,575.00 promissory note for the inventory and stock in the Store, and Plaintiffs paid Assignors $55,601.95 on October 8, 2012." In addition, Kutite complains that he relied upon the Assignment Documents, which did not include any mention of an ATM Agreement, when executing an Equipment Finance Lease Agreement for a new ATM on October 15, 2012.

We note, however, that some of the actions Kutite claims to have taken in reliance on the promise occurred before the alleged promise was made—that is, before Majors Management sent the documents to Kutite on September 27, 2012. These include his entering into the Agreement and Bill of Sale with the Assignors on September 6, 2012, and his $25,000 payment for good will around that time. Moreover, it is unclear how Majors Management's actions on September 27, 2012, could be considered a promise upon which Kutite could have reasonably relied. Not only were the Lease Agreement, the Fuel Supply Agreement, and the Assignment of Agreements each contingent upon final approval by the defendants, but the email to Kutite also explicitly conditioned the defendants' acceptance of the agreement upon further action by the defendants: "Once Scott Moon signs, we will send you and the assignor a copy of the Assignment of Agreements." Based on this email, Kutite should have known that returning the signed documents to Majors Management was not the final step.

This dovetails into the final problem we see with Kutite's argument—Kutite's reliance on any alleged promise was unreasonable. *See Alden*, 637 S.W.2d at 864. Without a signed document in his hands, or any indication of assent from the defendants, he began operating the store on

October 2, 2012. And that very day he was put on notice that there was a problem—the defendants would not finalize the assignment absent his signature on the ATM Agreement. Yet, two days later, with notice that the defendants, at least, did not consider the agreement final, he executed an Amendment to Agreement and Bill of Sale promising to secure a promissory note to pay the Assignors for the remaining fuel. Then, on October 8, he paid the Assignors $55,601.95, despite having been told 6 days earlier that the defendants did not consider the assignment finalized. And on October 15, 2012, despite knowing that the defendants were claiming the lack of a finalized agreement, and that the wrench was the ATM Agreement, Kutite entered into an agreement to use another company's ATM. As the district court stated, Kutite operated at his own risk, despite many red flags telling him that the transaction had not been finalized. For these reasons, we find any reliance on alleged promises unreasonable; Kutite's promissory estoppel claim, therefore, fails. *See Alden*, 637 S.W.2d at 864.[9]

---

[9] Kutite also argues that the defendants should be judicially estopped from arguing that there was no written, signed contract, contending that the defendants had previously sought to enforce a long-term agreement against Kutite in a prior proceeding. We are left to our own devices to determine the contours of the judicial estoppel claim. We know only that on September 24, 2013, after Kutite had begun running the store, the defendants filed for a Forcible Entry and Detainer Civil Warrant (FED Matter) against Kutite in the Shelby County Court of General Sessions, seeking money damages and his removal from the property. The alleged damages were based on items listed in an unpaid tenant ledger. According to the defendants, "the Civil Warrant does not make any reference to a lease agreement and there were no substantive proceedings on the FED Matter in the Court of General Sessions, which is not a court of record and which never issued any ruling. [Defendants] on November 6, 2014 voluntarily dismissed the FED Matter." We can only assume this is true because Kutite offers no evidence, or argument, to the contrary. Indeed, Kutite's cursory treatment of this issue, and his failure to provide us with sufficient information regarding the prior matter, renders us unable to review the issue; he has, therefore, forfeited it. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006). In any event, there is no evidence that the defendants actually asserted a contradictory position in the FED matter or that the Court of General Sessions adopted that contradictory position, thus rendering judicial estoppel inapplicable. *See Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008) ("The doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition." (quotation marks

*Punitive Damages.*  Finally, Kutite challenges the district court's decision that he was not entitled to punitive damages.  Because Kutite's breach of contract and estoppel claims fail, we need not discuss Kutite's challenge to the availability of punitive damages.

\* \* \*

We AFFIRM the judgment of the district court in favor of the defendants.

---

omitted)); *see also Watkins v. Bailey*, 484 F. App'x 18, 20 n.1 (6th Cir. 2012) ("[T]his court has held that, even in diversity actions like this one, federal law rather than state law governs application of [judicial estoppel] in the federal courts." (citation omitted)).

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree with my colleagues to affirm the grant of summary judgment on Kutite's breach-of-contract claim.

I respectfully dissent regarding Kutite's promissory-estoppel claim. As the majority notes, Defendants' Field Representative Karl House told Kutite that Kutite could place an ATM of his own choosing in the store. Defendants could have, but did not, correct that misrepresentation *before* the Assignment of Agreements were to take effect on October 1, 2012. Neither the ATM agreement nor any reference to an ATM agreement was included in the Assignment Documents Defendants emailed Kutite on September 27, 2012, which Kutite signed and returned to Defendants on September 28, 2012. It was only after the Assignment of Agreements were to take effect on October 1, 2012, and after Kutite *began operating the store* that Defendants first raised the ATM agreement.

Defendants' failure to mention the ATM agreement or include it in the Assignment Documents, and later insistence that it be signed after the fact, are even more egregious given that the ATM agreement, which was between the assignors and Tennessee Management, had a ten-year term and gave Tennessee Management the option to renew the agreement for two terms of five years. And, in the event of a breach by the assignor tenant, recourse was against the assignors, not Defendants.

The majority concludes that Kutite's reliance on any alleged promise was unreasonable because he began operating the store "without a signed document in his hands." (Maj. Op. at 18.) But it was Defendants that sprang the ATM agreement on Kutite only after he had returned the signed documents as directed and had begun operating the store on October 2, 2012; the package that Defendants presented to Kutite for signature before he began operating the store did not include an ATM agreement. Further, there is evidence that Defendants' manager Scott Moon did

in fact sign the Assignment Documents, and, as the district court noted, "even Defendants sought to enforce [against Kutite] a forum selection clause found within the agreement." (R. 25, PID 472.) Under these circumstances and viewing the evidence in the light most favorable to Kutite, a reasonable jury could find that Kutite reasonably relied on Defendants' representations, including Karl House's representation that Kutite could install an ATM of his own choosing in the store, signed the documents and began operating the store. Kutite suffered substantial economic detriment in reliance, and that reliance was foreseeable to Defendants.