IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 4, 2019 Session

**IN RE ESTATE OF JOHN E. MAYFIELD**

**Appeal from the Chancery Court for Cheatham County**
**No. P-2880      Suzanne Lockert-Mash, Judge**

_____

**No. M2018-01977-COA-R3-CV**

_____

The owner of a storage facility agreed to sell the facility and died shortly after signing the purchase and sale agreement. The buyer filed a claim with the estate, seeking specific performance of the agreement. The estate's administrator excepted to the claim, arguing that the agreement was unenforceable and that the decedent lacked the mental capacity to understand his actions when he signed the agreement. The trial court concluded that the agreement was not enforceable because there was no mutuality of assent to its terms and dismissed the buyer's claim. The buyer appealed, and we reverse the trial court's judgment and remand it for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER, J., joined, and D. MICHAEL SWINEY, C.J., filed a separate dissenting opinion.

Sara Elizabeth McManus, Chattanooga, Tennessee, and Alexandra Elizabeth Weiss, Nashville, Tennessee, for the appellant, John Bruce Saltsman, Jr.

Christopher Andrew Wilson and Charles Arthur Trost, Nashville, Tennessee, for the appellees, Community Foundation of Middle Tennessee, Inc. and Estate of John E. Mayfield.

**OPINION**

I. FACTUAL AND PROCEDURAL BACKGROUND

John E. Mayfield passed away on September 29, 2017. Two days earlier, on September 27, Mr. Mayfield executed a Commercial Purchase and Sale Agreement ("the Agreement"), pursuant to which he agreed to sell a storage facility located in Ashland

City, Tennessee to John Saltsman for $950,000. Mr. Saltsman filed a verified claim with Mr. Mayfield's estate in January 2018 seeking specific performance of the Agreement. The administrator of Mr. Mayfield's estate is the Community Foundation of Middle Tennessee, Inc. ("CFMT" or "the Administrator"), and it filed an exception stating that Mr. Saltsman's claim should be barred, disallowed, and dismissed on the basis that (1) the Agreement is void on its face, (2) Mr. Mayfield lacked the mental capacity to understand his actions when he signed the Agreement, (3) Mr. Mayfield was under the undue influence of Cindy Clayton, who facilitated the Agreement, and (4) Mr. Saltsman and Ms. Clayton engaged in fraud by preparing and inducing Mr. Mayfield to sign the Agreement. An evidentiary hearing took place on May 4, 2018, and the trial court issued an opinion on September 28, 2018, dismissing the claim. Mr. Saltsman appeals.

Ms. Clayton testified at the hearing, and she explained that she had known Mr. Mayfield for about twenty years. She worked as a housekeeper for both Mr. Mayfield and Mr. Saltsman. She also managed the storage facility at issue for Mr. Mayfield. Ms. Clayton testified that Mr. Mayfield had mentioned to her in February or March 2017 that someone had offered him a million dollars for the storage facility. Nothing ever came of that offer, but Ms. Clayton realized from Mr. Mayfield's comment that he may be interested in selling the facility. Sometime in early September 2017 Ms. Clayton informed Mr. Saltsman that there may be a storage facility for sale in Ashland City in case he was interested. Ms. Clayton testified:

> I mentioned it to Mr. Mayfield and he said yes, that he was interested in selling. So, I informed Mr. Saltsman that he was and he said that he would go and look at the property. I gave [Mr. Saltsman] the address. And then he, Mr. Saltsman, contacted me and said that he would like to see the inside of the property and meet Mr. Mayfield afterwards. And so I told Mr. Mayfield and he said yes, that's fine, and Mr. Saltsman had set up a time for that Saturday [the 23rd of September] at 2:00 p.m. to meet at the property and look at the inside.

Mr. Mayfield did not make it to the storage facility on Saturday to meet Mr. Saltsman because he had moved into Alive Hospice the previous evening. Mr. Mayfield asked Ms. Clayton to go in his place and show Mr. Saltsman the inside of the facility because she was familiar with the "water and electricity and all of that."

Ms. Clayton testified that she met Mr. Saltsman at the facility at 2:00 on Saturday afternoon, September 23, 2017. Mr. Mayfield phoned Ms. Clayton later that evening to find out if Mr. Saltsman was still interested in purchasing the property, and Ms. Clayton told Mr. Mayfield that he was. Ms. Clayton testified about how the parties arrived at the purchase price of $950,000:

Q. Did Mr. Saltsman make an offer that day when you guys were at the storage facility?

A. Yes.

Q. What did he offer?

A. 900. He said he would start at around 900.

Q. Okay. Did Mr. Mayfield -- did you convey that offer to Mr. Mayfield or did he counter that offer at all?

A. No. I knew that Mr. Mayfield had said a million from the previous buyer so I went in the middle and told Mr. Mayfield that he offered 950 and Mr. Mayfield said I accept – I'll take it.

Mr. Saltsman testified at the hearing, and his testimony was consistent with Ms. Clayton's regarding the events that led up to the preparation of the Agreement. Mr. Saltsman explained that he first learned about the property from Ms. Clayton, who asked him if he would be interested in buying a storage facility in Ashland City. Mr. Saltsman testified:

A. I had said I would like to go look at it and I went to go look at it. Was interested. Started negotiations.

Q. So did you make an offer on the property?

A. I asked Cindy, I said tell me how much and she said Mr. Mayfield said a million dollars. After I looked at it I offered 900,000. He came back and said 950,000. Said, "Sounds good to me. Send me a contract."

Ms. Clayton testified that she informed Mr. Mayfield about the offer on Sunday, September 24, by text at 9:44 a.m., and Mr. Mayfield texted Ms. Clayton back at 9:54 a.m., writing "I'll take it." Then, two days later, on September 26, Ms. Clayton and Mr. Mayfield corresponded by text about Mr. Mayfield's real estate attorney. Mr. Mayfield asked Ms. Clayton to go to his real estate attorney's office to have a contract drafted. Ms. Clayton testified that Mr. Saltsman had agreed to pay the $950,000 purchase price before she contacted Mr. Mayfield's real estate attorney about drawing up the contract. She testified as follows:

Q. Had Mr. Saltsman accepted the $950,000 figure - -

A. Yes.

Q. - - at that time?

A. Yes, ma'am.

On the morning of September 27, Ms. Clayton was at the office of Mr. Mayfield's real estate attorney when she sent Mr. Mayfield a text at 8:44 that read, "Hey, Dana[1] wanted to know who will pay for title insurance? And I'll bring a contract by shortly to sign, ok." Mr. Mayfield responded by text at 9:00 a.m., "I'll pay for deed and title." Ms. Clayton testified that once she had the Agreement, she went directly to Alive Hospice to bring it to Mr. Mayfield. The sign-in sheet at the hospice shows that Ms. Clayton arrived at 9:45 a.m. Ms. Clayton then testified about Mr. Mayfield's condition that morning, when he signed the Agreement:

Q. Did Mr. Mayfield look at the contract?

A. Yes, ma'am.

Q. Did he seem to read it?

A. Yes, ma'am.

Q. Did you have to help him to sign it at all?

A. No, ma'am.

Q. Did he sign the contract?

A. Yes, ma'am.

Q. Did he ask any questions about it at that time?

A. No, ma'am.

Q. Did Mr. Mayfield ask you to do anything else while you were there?

A. He asked me to hand him his briefcase out of the -- his black bag out of the closet; that he had a lady that had moved out of a storage unit and needed a deposit check back and then a check to the heating and air guy for repairs, and I handed him his black bag and he opened it up and got the check, wrote out two checks and I mailed them.

---

[1]Dana was a secretary at Mr. Mayfield's real estate attorney's office.

Q. So is it fair to say that although Mr. Mayfield was in hospice he was still conducting business?

A. Yes, ma'am.

Q. Do you have any other observations of Mr. Mayfield from that day? Did he seem to know what he was doing?

A. Yeah. I handed him my ink pen out of my purse and in the beginning, because he said he didn't know where his ink pen was, and he looked at it and he said, "It's not one of my pens, I don't want to use it." Because he had his own John E. Mayfield pens.

Q. So he signed the contract with his own pen.

A. With my pen. He didn't want to, he wanted his pen.

Ms. Clayton testified that Mr. Mayfield signed his name and wrote the date and time on the Agreement without anyone's assistance. The Agreement included a clause providing that Ms. Clayton would be paid a "10% Facilitator Fee" to be "Paid by Seller." Ms. Clayton was asked whether she filed a claim against the estate or otherwise tried to enforce this claim, and she responded, "No." Ms. Clayton testified further as follows:

Q. Did you ask Mr. Mayfield to pay you a commission for this sale?

A. I asked if I was going to get a bonus. He called me and that was when he told me how much and I couldn't believe that, I wasn't expecting it.

Q. So you didn't ask him for ten percent of the commission.

A. No. No.

Q. Did you ever ask Mr. Mayfield for any gifts or monetary compensation other than the compensation you received as an employee?

A. No, ma'am.

Ms. Clayton testified that after Mr. Mayfield signed the Agreement, she brought it to Mr. Saltsman's house and left it on the table, as Mr. Saltsman asked her to do. Mr. Saltsman explained that he was traveling when Mr. Mayfield signed the Agreement:

Q. Did you talk with Cindy at all the day that Mr. Mayfield signed the contract or were you at all aware of when exactly he signed it?

- 5 -

A. I was traveling and she texted me, said we got a signed contract. I said, "Take it to my house and leave it. When I get back in town, I'll sign it and send it back."

Q. So when you returned from your trip, is that the first time you saw the written contract?

A. It is.

Ms. Clayton testified that Dana contacted her after she left the Agreement at Mr. Saltsman's house to inform her that the Agreement was "the wrong contract." Ms. Clayton testified that she contacted Mr. Saltsman to let him know there was a problem with the contract and that it had to be rewritten.[2] According to Ms. Clayton, Mr. Saltsman said "okay" and asked that the name of the buyer be changed to "S&S Storage." Before a new contract could be drafted and executed, however, Mr. Mayfield died.

Mr. Saltsman testified that he returned to his house on September 30, the day after Mr. Mayfield died, and that he did not see the Agreement until that day. He did not recall Ms. Clayton's telling him of any problems with the contract. After learning of Mr. Mayfield's death, Mr. Saltsman was not sure what to do. He had recently lost his father and knew "there's a lot of chaos when this happens." He testified that he waited a couple of weeks before contacting Michael McDaniel, the authorized agent and trustee for CFMT and executor of Mr. Mayfield's estate. Mr. Saltsman sent Mr. McDaniel an e-mail and attempted to reach him by telephone.

Mr. Saltsman ultimately filed a verified claim with the estate on February 5, 2018. He attached a photocopy of the Agreement with his claim that included Mr. Mayfield's signature dated "9/27/17 at 9:47." Mr. Mayfield had checked the "a.m." box to reflect that he signed the Agreement in the morning. After the estate filed an exception to his claim, Mr. Saltsman filed an amended claim with the estate on April 5, 2018, with another photocopy of the Agreement, but with the amended claim, Mr. Saltsman added his signature to the Agreement.

The trial court made the following findings with respect to Mr. Mayfield's mental state when he signed the Agreement:

[I]t would appear that Mr. Mayfield was an astute businessman who was still in the process of selling properties and conducting business well into his illness. He was a man who lived life on his own terms and spoke his mind. He could be very generous as evidenced by his charitable gifts and he

---

[2]Ms. Clayton did not know what the problem was, and no evidence was introduced during the hearing regarding what the problem with the Agreement might have been.

could be somewhat aloof. There were no medical witnesses called who could testify that in the later stages of his illness he did not possess the mental capacity to understand his actions. Friends and business associates testified that certainly the pain medication that he was taking and the fact that he knew he was dying affected his personality but there was no testimony that convinced this court that he lacked the mental capacity to understand that he was signing the contract for the sale of the storage facility.

With regard to CFMT's argument that Mr. Mayfield was suffering from undue influence when he signed the Agreement, the court found:

[T]here was no testimony that indicated that he was under the undue influence of Cindy Clayton. She was the manager of the storage center, she knew both parties and the contract was drawn by the Decedent's own attorney whom he used for all of his real estate transactions.

The court further found that "there was no testimony that fraud was committed by John Saltsman and Cindy Clayton."

The trial court then considered whether there was "a meeting of the minds of all parties in mutual assent of the terms" to determine whether the Agreement constituted an enforceable contract between Mr. Mayfield and Mr. Saltsman. The court wrote:

The Court can look to the conduct of the parties to determine if there is mutual assent. In looking at the testimony of Ms. Clayton, she would benefit if the Court determined that a contract existed. Yet she testified that she was informed that the contract was not valid and that a new contract would need to be prepared. She stated that she informed Mr. Saltsman of this and he did not object to the preparation of a new contract and asked for a change in the name of the buyer. He was notified immediately of the problem according to Ms. Clayton. Mr. Saltsman, who would benefit if the Court found that the contract was enforceable, testified that he does not remember Ms. Clayton telling him of a problem. The Court finds the testimony of Ms. Clayton more credible. Also the Court looks to the fact that Mr. Saltsman did not sign the contract until almost seven months after the death of the Decedent. Even then he failed to fill in the date of his signature. The question is not whether the contract was null and void according to the Decedent's agents but whether Mr. Saltsman, upon receiving this information, failed to assent to the terms. It would appear based on Ms. Clayton's testimony and the conduct of the Claimant, that there was insufficient mutual assent as to the sales agreement, therefore,

judgment shall be entered in favor of the Estate and the verified claim shall be dismissed.

Mr. Saltsman appealed, arguing that the trial court erred by (1) failing to find that he and Mr. Mayfield had an enforceable agreement and (2) dismissing his verified claim against the estate and denying his request for specific performance. The Administrator argues that if we find mutuality of assent between Mr. Mayfield and Mr. Saltsman as to the terms of the Agreement, it is unenforceable because Mr. Mayfield lacked the mental capacity on September 27, 2017, to understand that he was signing a contract for the sale of the storage facility.

II. ANALYSIS

A. Standard of Review

Issues surrounding contract formation and interpretation involve questions of law that appellate courts review de novo, affording no deference to the trial court's legal conclusions. *ICG Link, Inc. v. Steen*, 363 S.W.3d 533, 543 (Tenn. Ct. App. 2011); *see also Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). We apply a presumption of correctness to a trial court's findings of fact, however, which we will not reverse on appeal absent a preponderance of evidence to the contrary based on a de novo review of the record. TENN. R. APP. P. 13(d); *ICG Link*, 363 S.W.3d at 543. A trial court is in the unique position of being able to observe a witness's demeanor and manner as he or she testifies. *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 24 (Tenn. Ct. App. 2005). Because of this, "'trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations.'" *Id.* (quoting *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998)). As a result, we will defer to the trial court's credibility determinations "'unless there is concrete, clear, and convincing evidence to the contrary.'" *Id.* (quoting *Mitchell*, 971 S.W.2d at 29; *see also ICG Link*, 363 S.W.3d at 543; *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002).

B. Mutuality of Assent

To be enforceable, "[a] contract 'must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.'" *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)); *see also T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 865 (Tenn. Ct. App. 2002). In concluding that Mr. Mayfield and Mr. Saltsman lacked the mutual assent necessary to have an enforceable contract, the trial court relied

on (1) Ms. Clayton's testimony that someone from Mr. Mayfield's real estate attorney's office informed her that the Agreement was not valid and would have to be redrafted and (2) the fact that Mr. Saltsman did not sign the Agreement until nearly seven months following Mr. Mayfield's death, and "[e]ven then he failed to fill in the date of his signature."

Ms. Clayton testified that after Mr. Mayfield signed and dated the Agreement, and after she left the Agreement at Mr. Saltsman's house, someone from Mr. Mayfield's real estate attorney's office informed her that the Agreement was invalid and would have to be rewritten. Ms. Clayton testified that she relayed this information to Mr. Saltsman and that he said "okay" and asked, if the contract was going to be redrafted, to change the identity of the buyer from him to S&S Storage. Mr. Saltsman testified that he did not recall being informed by Ms. Clayton that there was any problem with the contract. The trial court found Ms. Clayton to be more credible on this issue.

According to the trial court, "The question is not whether the contract was null and void according to the Decedent's agents but whether Mr. Saltsman, upon receiving this information, failed to assent to the terms." It is not clear to this Court the "terms" to which the trial court was referring. The Agreement identifies the parcel of property at issue, and it includes the purchase price, the date of closing, and the signature of the party to be charged, Mr. Mayfield.[3] The closing was scheduled to take place on November 17, 2017, at Mr. Mayfield's real estate attorney's office. No evidence was introduced that Mr. Saltsman was not ready and willing to close on that date. Paragraph 15 of the Agreement states that it "shall be for the benefit of, and be binding upon, the parties hereto, their heirs, successors, legal representatives and assigns."

Contract interpretation involves "'ascertain[ing] and giv[ing] effect to the intent of the parties,'" *Dick Broad. Co.*, 395 S.W.3d at 659 (quoting *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009)), which is determined by reviewing "the plain and ordinary meaning of the written words" used in the contract, *id.* (citing *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011)). Our first task is to determine whether the language used in the contract is ambiguous. *Ray Bell Constr. Co., Inc. v. Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386-87 (Tenn. 2011); *see also APAC-Atl., Inc., Harrison*

---

[3]These terms seem to be the essential, or material, terms of the Agreement. In addressing "[i]ndefiniteness regarding an essential element of a contract," our Supreme Court wrote that an enforceable contract "'must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties.'" *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (quoting *Jamestowne On Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 565 (Tenn. Ct. App. 1990) and *Higgins v. Oil, Chem., and Atomic Workers Int'l Union, Local #3-677*, 811 S.W.2d 875, 880 (Tenn. 1991). This case is not like *Peoples Bank of Elk Valley v. Conagra Poultry Co.*, 832 S.W.2d 550, 553-54 (Tenn. Ct. App. 1991), where the Court of Appeals wrote that "[i]f the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." (citing RESTATEMENT (2D) CONTRACTS § 33 (1981)).

*Constr. Div. v. State*, No. E2012-01536-COA-R3-CV, 2013 WL 5883697, at *3 (Tenn. Ct. App. Oct. 31, 2013). If the language is not ambiguous, we determine the parties' intent "from the four corners of the contract." *Ray Bell*, 356 S.W.3d at 387; *see also APAC-Atlantic*, 2013 WL 5883697, at * 3. Neither party to the current dispute contends that the Agreement is ambiguous. Thus, our interpretation of the Agreement is limited to the language contained within it.

In ruling that Mr. Saltsman and Mr. Mayfield did not mutually assent to the terms of the Agreement, the trial court relied on Ms. Clayton's testimony that she informed Mr. Saltsman that the contract would have to be rewritten. This testimony by Ms. Clayton is extraneous and irrelevant to the issue whether Mr. Mayfield and Mr. Clayton had already reached an enforceable agreement by that time, however, and it should not have been considered in interpreting the Agreement. As the *Staubach* Court explained, "to allow a party to a contract to admit that the party signed the contract but to deny that the terms of the contract express the party's agreement would destroy the value of contracts." *Staubach*, 160 S.W.3d at 525. We believe Ms. Clayton's testimony regarding the Agreement's invalidity, which occurred after Mr. Mayfield executed the Agreement and after Ms. Clayton delivered it to Mr. Saltsman's house, was extraneous and irrelevant because Mr. Mayfield and Mr. Saltsman already had an enforceable contract by that time.

The case of *Hillard v. Franklin* is instructive. The defendant/seller in that case agreed to sell real property to the plaintiffs/buyers, and the parties signed a contract for the sale of the property. *Hillard*, 41 S.W.3d at 109. The parties' contract included a clause providing that a third-party who resided on the property in a mobile home would be permitted to remain on the property following the sale. *Id.* After the contract was executed by both parties, the seller told the buyers that she was not satisfied with the wording of the clause regarding the third-party resident and that she wanted to revise the contract. The buyers did not object. *Id.* at 110. However, after a revised contract was prepared, the seller refused to sign the contract and the closing did not take place. *Id.* at 110-11. The buyers sued the seller, seeking specific performance. *Id.* at 111. The trial court granted the buyers the relief they requested, and the seller appealed. *Id.* In affirming the trial court, this Court found that the parties had a meeting of the minds regarding the third-party resident's right to remain on the property at issue. *Id.* at 112. We found that the contract the parties signed was unambiguous and that "the court may not consider extraneous evidence indicating that Seller signed the agreement under the belief that the language would later be changed." *Id.*

The same reasoning applies to the facts of this case. The Agreement is unambiguous, and the trial court should not have considered the extraneous evidence regarding a replacement contract when there was already mutuality of assent with respect to the terms of the Agreement. Mr. Mayfield expressed a desire to sell the storage facility and signed the contract presented to him to effectuate the sale. Mr. Saltsman expressed a desire to purchase the storage facility and a willingness to sign the Agreement, and,

allowing for some time to pass after Mr. Mayfield died, he has been attempting to enforce the Agreement since shortly after receiving it from Ms. Clayton.

The Administrator contends that Mr. Saltsman's request that Ms. Clayton have the name of the buyer changed from himself to S&S Storage constituted a counter-offer that was never accepted by Mr. Mayfield. We reject this contention because, as discussed above, Mr. Mayfield and Mr. Saltsman had already reached a binding agreement before this request was made, and Mr. Saltsman's request to change the name of the buyer to S&S Storage was not made a condition of the Agreement and did not alter the efficacy of the Agreement.[4]

We now turn to the other basis on which the trial court concluded there was no mutual assent to the terms of the Agreement: that Mr. Saltsman did not sign the Agreement until nearly seven months after Mr. Mayfield died. As early as 1919, the law in this State has been that the acceptance of an offer to buy or sell is binding once the acceptance is communicated to the other party. *Cole-McIntyre-Norfleet Co. v. Holloway*, 214 S.W. 817, 818 (Tenn. 1919). In *Cole-McIntyre-Norfleet Co.*, our Supreme Court stated that an acceptance can be communicated "by a formal acceptance, or acts amounting to an acceptance." *Id.*

Tennessee's statute of frauds requires contracts for the sale of land to be in writing and "signed by the party to be charged therewith." Tenn. Code Ann. § 29-2-101(a)(4). The statute does not require that both the offeror and offeree sign the contract; it only requires the signature of the party to be charged. The statute makes clear that "[i]n a contract for the sale of lands, tenements, or hereditaments, the party to be charged is the party against whom enforcement of the contract is sought." *Id.* In the case at bar, Mr. Mayfield's estate is the party to be charged because his estate, which stands in place of Mr. Mayfield, is the party against whom enforcement of the Agreement is sought. Because Mr. Mayfield signed the Agreement, the Agreement satisfies the statute of frauds.

Our case law provides that "when an agreement is reduced to writing but is signed by only one of the parties, it is binding on the non-signing party if that party has

---

[4]We note that the Restatement (Second) of Contracts § 59 (1981) addresses counter-offers, stating:

> A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.

*See Parisi v. Ryan's Family Steakhouse*, No. W2004-01671-WC-R3-CV, 2005 WL 850158, at *4 (Tenn. Workers Comp. App. Panel Apr. 13, 2005) (citing RESTATEMENT (SECOND) OF CONTRACTS § 59 with approval); *cf. Grace v. Grace*, No. W2016-00650-COA-R3-CV, 2016 WL 6958887, at *4 (Tenn. Ct. App. Oct. 26, 2016) (stating counter-offer must materially alter terms of offer). No evidence was introduced that Mr. Saltsman ever made his request for a name change a condition of the sale.

manifested consent to its terms." *T.R. Mills Contractors*, 93 S.W.3d at 866; *see Moody Realty Co. Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) ("[T]he signatures of parties to a written agreement are not always essential to establish a binding contract.") (citing *Staubach*, 160 S.W.3d at 524, and *T.R. Mills Contractors*, 93 S.W.3d at 866); *see also Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 350 (Tenn. Ct. App. 1999). As the *Moody Realty Co.* court wrote,

> One function of the signature is to show the signor's intent to be bound by the terms stated, but other manifestations of assent can serve the same purpose in the absence of signature. *See Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002). The parties' actions or inactions, as well as spoken words, can establish mutual assent. *Id.* (citing *Cole-McIntyre-Norfleet Co. v. Holloway*, 214 S.W. 817, 818 (Tenn. 1919)). "[T]he existence of a contract, the meeting of the minds, the intention to assume an obligation, and the understanding are to be determined . . . not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances." *Scandlyn v. McDill Columbus Corp.*, 895 S.W.2d 342, 345 (Tenn. Ct. App. 1994) (quoting *APCO Amusement Co. v. Wilkins Family Rests. of America*, 673 S.W.2d 523, 527 (Tenn. Ct. App. 1984) (citations omitted)).

*Moody Realty Co.*, 237 S.W.3d at 674-75. The critical issue in contract cases is whether the parties have manifested a "mutual assent to be bound." *T.R. Mills Contractors*, 93 S.W.3d at 866. Courts use "an objective standard based upon the parties' manifestations" to determine whether there was mutuality of assent. *Staubach*, 160 S.W.3d at 524 (citing *T.R. Mills Contractors*, 93 S.W.3d at 866).

Ms. Clayton facilitated the parties' agreement by communicating to each party on behalf of the other. Mr. Mayfield and Mr. Saltsman never met and never communicated directly with one another. Mr. Saltsman testified that he told Ms. Clayton to convey his offer of $900,000 to Mr. Mayfield. Ms. Clayton conveyed the purchase price of $950,000 to Mr. Mayfield, who responded, "I'll take it." When Ms. Clayton told Mr. Saltsman that Mr. Mayfield wanted $950,000 for the storage facility, Mr. Saltsman agreed to pay that amount and responded, "Send me a contract." When Ms. Clayton communicated Mr. Saltsman's offer to pay $950,000 for the storage facility (rather than the $900,000 Mr. Saltsman asked Ms. Clayton to offer), Mr. Mayfield accepted what he believed to be Mr. Saltsman's offer to pay that amount. When Ms. Clayton then communicated Mr. Mayfield's desire to sell the facility for $950,000 to Mr. Saltsman, Mr. Saltsman accepted what he believed was Mr. Mayfield's counter-offer. There is no dispute that before the Agreement was drafted and presented to Mr. Mayfield to sign, Mr. Mayfield had agreed to accept, and Mr. Saltsman had agreed to pay, $950,000 for the storage facility. The Agreement merely memorialized the parties' agreement and the

statute of frauds was satisfied when Mr. Mayfield signed the Agreement on September 27.

The analysis does not change because Mr. Saltsman did not see the Agreement until after Mr. Mayfield died. Contrary to the trial court's analysis, it is immaterial under these facts whether Mr. Saltsman ever signed the Agreement because Mr. Mayfield is the party to be charged, and he signed the Agreement.

C.  Mr. Mayfield's Mental Capacity

The Administrator argues that even if we conclude that Mr. Mayfield and Mr. Saltsman had a meeting of the minds with regard to the terms of the sale, the Agreement is unenforceable because Mr. Mayfield lacked the mental capacity to understand what he was signing on September 27, 2017.[5] The courts presume all adults are competent to enter into contracts. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001). Thus, the party seeking to set aside a contract based on mental incapacity must prove "that one or both of the contracting parties were mentally incompetent when the contract was formed." *Id.*; *see also In re Estate of Reynolds*, 2007 WL 2597623, at *10.

We addressed the degree of mental capacity an individual must possess to enter into an enforceable contract in *Rawlings v. John Hancock Mutual Life Insurance Co.*, where we wrote:

> Competency to contract does not require an ability to act with judgment and discretion. *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991). All that is required is that the contracting party reasonably knew and understood the nature, extent, character, and effect of the transaction. *Mays v. Prewett*, 98 Tenn. 474, 478, 40 S.W. 483, 484-85 (1897); *In re Estate of Holmes*, No. 02A01-9707-PB-00158, 1998 WL 134333, at *3 (Tenn. Ct. App. Mar. 26, 1998) (No Tenn. R. App. P. 11 application filed); *Roberts v. Roberts*, 827 S.W.2d 788, 791-92 (Tenn. Ct. App. 1991). Thus, persons will be excused from their contractual obligations on the ground of incompetency only when (1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has

---

[5]Mr. Saltsman contends that CFMT waived this issue by failing to designate Mr. Mayfield's mental capacity as an issue in its brief as required by Tenn. R. App. P. 27(b). Mr. Saltsman is correct that CFMT failed to include a Statement of Issues section in its brief as required by the rules, but we note that CFMT identified this issue in its table of contents and devoted a section of its brief to arguing this issue. Under these circumstances, we exercise our discretion to find that CFMT has not waived this issue. *See* TENN. R. APP. P. 2 (permitting appellate courts to suspend rules for good cause).

reason to know of their condition. RESTATEMENT (SECOND) OF CONTRACTS
§ 15(1) (1981).

*Rawlings*, 78 S.W.3d at 297; *see also In re Estate of Reynolds*, 2007 WL 2597623, at *9. The issue whether Mr. Mayfield had the requisite mental capacity to enter into the Agreement is a question of law. *See Rawlings*, 78 S.W.3d at 297.

The Administrator relies on the medications Mr. Mayfield was taking on September 27 (Morphine, Hydrocodone, Lorazepam, McContin, and Valium) to prove that he lacked the mental capacity to enter into a contract that day. According to the Administrator, "Common knowledge dictates that this powerful, mind altering drug cocktail significantly impaired Mr. Mayfield's mental competency the day he signed the Offer." The Administrator also relies on the testimony of laypersons to prove Mr. Mayfield's mental state. Anita Smith stated that she dated Mr. Mayfield for fifteen years, and she testified that "Wednesday, Wednesday night was hell day, hell night" and Mr. Mayfield was "for all practical purposes, gone" on Thursday, September 28. Ms. Smith explained:

> He went into a coma early Thursday. So Wednesday was his last day where he was struggling to stay alive. Wednesday night was horrific and it was so bad that they gave him like the maximum amount of Morphine that he could have by Wednesday night - - Thursday morning.

The Administrator also relies on testimony by Mr. McDaniel, the executor of Mr. Mayfield's estate. Mr. McDaniel visited Mr. Mayfield around 2:00 on Wednesday afternoon, and he described Mr. Mayfield's mental state as follows:

> All I could say is John wasn't John, and I've been with a lot of people in Alive Hospice, family and all that, and I just did not have a good feeling with John. Words weren't very clear and they weren't completed. So he never really made a complete sentence. He would drop off at a period of time.

As we discussed above, Mr. Mayfield and Mr. Saltsman agreed to the terms of the sale of the storage facility before the Agreement was drafted and signed by Mr. Mayfield. The written Agreement was simply a memorialization of the terms upon which they had already agreed, and it satisfied the statute of frauds. The Administrator does not contend Mr. Mayfield lacked the mental capacity to agree to the terms of the sale prior to September 27, 2017. However, even if we assume the parties' agreement was not finalized until the Agreement was drafted and Mr. Mayfield signed it on September 27, we find that CFMT failed to prove either that Mr. Mayfield did not understand the nature and consequences of the transaction or that Mr. Saltsman had reason to know that Mr. Mayfield was unable to act in a reasonable manner in relation to the transaction. *See*

- 14 -

*Rawlings*, 78 S.W.3d at 297. Ms. Clayton described Mr. Mayfield's condition when she brought him the Agreement to sign. She testified that he reviewed and signed the Agreement without assistance from anyone else. He even asked for his own pen when Ms. Clayton handed him her pen to sign the Agreement. Mr. Mayfield did not just sign his name, he also noted the date and time of his signature. Ms. Smith, who was not in the room when Mr. Mayfield executed the Agreement, identified the signature as belonging to Mr. Mayfield.

The Administrator correctly points out that lay witnesses may provide evidence of an individual's competency or capacity. *See In re Estate of Elam*, 738 S.W.2d 169, 172 (Tenn. 1987). However, the testimony upon which CFMT relies focuses on Mr. Mayfield's condition Wednesday afternoon, evening, and Thursday morning. Ms. Smith did not see Ms. Clayton the morning of September 27, and neither Ms. Smith nor anyone other than Ms. Clayton testified about Mr. Mayfield's condition at the time he signed the Agreement.[6] His mental condition after signing the Agreement is irrelevant. The evidence shows that Mr. Mayfield "was oriented to 'person, time, place, and situation' and that [he] was 'aware of what [he] was doing.'" *Rawlings*, 78 S.W.3d at 298. The Administrator did not offer testimony from any experts regarding the effects, if any, of the medications Mr. Mayfield had been given on his ability to know and understand the nature, extent, character, and effect of the transaction. *See id.* The fact that he was given particular medications is not enough, by itself, to prove that Mr. Mayfield lacked the mental capacity to execute the Agreement on the morning of September 27. We affirm the trial court's determination that Mr. Mayfield had the mental capacity to understand his actions and hold that CFMT failed to prove that Mr. Mayfield lacked the mental capacity to understand that he was signing the contract for the sale of the storage facility.

D. Specific Performance

Mr. Saltsman argues he is entitled to specific performance of the Agreement. Specific performance of a contract to sell real property can be asserted by either the buyer or seller of the property. *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979). It is not available as a matter of right, but it may be granted in the discretion of the court if the contract at issue is "'clear, definite, complete and free from any suspicion of fraud or unfairness.'" *Id.* (quoting *Johnson v. Browder*, 207 S.W.2d 1, 3 (Tenn. 1947)).

> "If a contract has all the essentials of validity, and is certain in its terms, is based on an adequate and valuable consideration, is fair and just in all its provisions, is free from any fraud, misrepresentation, illegality, or mistake,

---

[6]Ms. Smith testified that Mr. Mayfield was very weak the morning of September 27, and she did not think he would have been able to read the Agreement. However, Ms. Clayton testified that Mr. Mayfield reviewed the Agreement, and the trial court found "there was no testimony that convinced [it] that he lacked the mental capacity to understand that he was signing the contract for the sale of the storage facility."

is capable of being enforced without hardship to either party, and if compensation in damages for its breach would be inadequate, a bill will be maintained for its specific performance."

*Id.* (quoting GIBSON'S SUITS IN CHANCERY, 5th ed., p. 237, Vol. 2); *see also Scott v. Jeffers*, No. 36, 1989 WL 3110, at *3 (Tenn. Ct. App. Jan. 20, 1989). Specific performance is not available when there is an adequate remedy at law. *Shuptrine*, 597 S.W.2d at 730 (citing *Gilson v. Gillia*, 321 S.W.2d 855, 866 (Tenn. Ct. App. 1958)). However, "in cases where the contract sought to be specifically enforced relates to land, or an interest in land, more often than not, an award of damages is not an adequate remedy." *Id.*; *see Brister v. Estate of Brubaker*, 336 S.W.2d 326, 332 (Tenn. Ct. App. 1960) (reversing trial court's refusal of award of specific performance in case involving contract for sale of land). Specific performance will not be awarded when it would "be harsh, inequitable, oppressive, or result in an unconscionable advantage." *Bush v. Cathey*, 598 S.W.2d 777, 781 (Tenn. Ct. App. 1979).

The trial court did not discuss whether specific performance would be an appropriate remedy in this case because it concluded that the parties did not have mutuality of assent. The record shows that Mr. Mayfield intended to sell and Mr. Saltsman intended to purchase the storage facility in Ashland City for $950,000. No evidence has been presented that the purchase price is inadequate or that any fraud, misrepresentation, illegality, or mistake was present in this case. However, because the trial court did not address whether specific performance would be an appropriate remedy, we remand this case to allow the trial court to consider whether awarding Mr. Saltsman the remedy of specific performance would be harsh, inequitable, oppressive, or unconscionable in the circumstances. If it is not, we direct the trial court to award Mr. Saltsman specific performance of the Agreement.

## III. CONCLUSION

The judgment of the trial court is reversed, and this matter is remanded for further proceedings in accordance with this opinion. Costs of appeal shall be assessed against the appellees, Community Foundation of Middle Tennessee, Inc. and Estate of John E. Mayfield, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE